Sheila SIMS, Plaintiff–Appellant,
Cross–Appellee,

v.

John MULCAHY, Defendant–Appellee,
Cross–Appellant,

and

City of Madison, Thomas Hischke, Robert
Peterson, Jerome Gartner, Robert Bir-
renkott and Paul Anderson, Defen-
dants–Appellees.

Nos. 89–1523, 89–1639.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 5, 1989.

Decided May 9, 1990.

Kathleen A. Wagner, Madison, Wis., for plaintiff-appellant, cross-appellee.

Steven J. Schooler, Lawton & Cates, Bradley D. Armstrong, Michael J. Modl,

Axley & Brynelson, Madison, Wis., for defendants-appellees, cross-appellant.

Before COFFEY and RIPPLE, Circuit Judges, and DUMBAULD, Senior District Judge.*

COFFEY, Circuit Judge.

Plaintiff–Appellant, Sheila Sims, brought this action under 42 U.S.C. §§ 1981 and 1983, alleging that Defendants–Appellees, the City of Madison, John Mulcahy, Thomas Hischke, Robert Peterson, Jerome Gartner, Robert Birrenkott and Paul Anderson, violated 42 U.S.C. § 1981, as well as the fourth and fourteenth amendments to the United States Constitution in disciplining her for tardiness, in entering her apartment to ascertain her physical well being in connection with one particular incident of tardiness and in subjecting her to racial harassment. The district court entered summary judgment in favor of all defendants on all of the relevant claims except for the claims against John Mulcahy and Paul Anderson with respect to their entry of Sims' residence. Sims proceeded to trial against Mulcahy and Anderson, and a jury found that Mulcahy violated the fourth amendment to the United States Constitution in entering Sims' apartment.[1] However, the jury found that the entry was not racially discriminatory under the Fourteenth Amendment's Equal Protection Clause or 42 U.S.C. § 1981. Following a subsequent trial on the issue of damages, the jury determined that Sims was not entitled to any damages for Mulcahy's entry of her apartment. As a result of Sims' failure to obtain any relief, judgment was entered in favor of Mulcahy and all other defendants dismissing Sims' action with prejudice. Sims appeals from this judgment, while Mulcahy cross-appeals from the district court's refusal to grant him qualified immunity. We affirm.

## I.

### FACTS

Sheila Sims is a black woman who has been employed by the City of Madison, Wisconsin, since 1975. Sims has worked as a parking monitor for the City's police department since 1980.

Sims has evidenced a problem with oversleeping that has resulted in a number of reported incidents of tardiness over the years she has been employed as a parking monitor. The City of Madison, Wisconsin, Police Department has a written policy in Section 2–1817 of its Policies and Procedures Manual which provides as follows: "Members of the Department shall be punctual in their reporting for duty at the time designated by their superior officers. Habitual failure to report promptly at the time directed will be deemed neglect of duty." As further defined by the Department's custom and practice, the first instance of tardiness within a 12–month period results in a letter of understanding, two incidents within six months result in a letter of reprimand, and three incidents within a year result in a one-day suspension. Over the years Sims has worked for the Madison Police Department, Sims' tardiness record reveals a number of instances of tardiness that, in the district court's words, have resulted in "a record of tardiness unrivaled by any of her co-workers." *Sims v. City of Madison,* No. 88–C–524, Memorandum and Order on Summary Judgment at 17 (W.D. Wis. December 19, 1988). We reproduce Sims' tardiness record below:

| Date | Time Tardy | Disciplinary Action | Officers Involved |
| --- | --- | --- | --- |
| 4/3/80 | 6 minutes | AWOP[2] .09 verbal counseling | Sgt. Birrenkott |

---

* The Honorable Edward Dumbauld, Senior District Judge for the Western District of Pennsylvania, is sitting by designation.

1. The jury found that Paul Anderson did not violate the Constitution in entering Sims' apartment.

2. AWOP denotes absent without pay and the number following each AWOP notation reflects the hours or fractions thereof that Sims was absent without pay. Furthermore, the tardiness of June 8, 1985, was excusable by virtue of a public bus delay, an excuse the Madison Police Department routinely accepts for tardiness.

| Date | Time Tardy | Disciplinary Action | Officers Involved |
|---|---|---|---|
| 5/1/80 | a few minutes | | Sgt. Mallov |
| 5/5/80 | 10 minutes | AWOP .16 verbal counseling | Sgt. Mallov |
| 5/6/80 | 10 minutes | AWOP .16 verbal counseling | Sgt. Mallov |
| 7/23/80 | 10 minutes | AWOP .16 verbal reprimand & documentation of tardiness pattern, dated 7/24/80 | Sgt. Birrenkott |
| 7/25/80 | 8 minutes | AWOP .13 letter of reprimand, dated 8/18/80 (concerns 8/8/80 incident as well) | Sgt. Birrenkott Sgt. Ninneman |
| 8/8/80 | 4 minutes | AWOP .07 letter of reprimand dated 8/18/80 | Sgt. Birrenkott Sgt. Ninneman |
| 6/12/82 | 5 hours | AWOP 5.00 verbal reprimand | Sgt. Birrenkott |
| 2/27/84 | 5 minutes | AWOP .08 verbal reprimand | Sgt. Birrenkott |
| 2/6/85 | 8 minutes | AWOP .13 verbal reprimand | Sgt. Birrenkott |
| 6/8/85 | 40 minutes | AWOP .67 letter of reprimand dated 6/12/85 | Sgt. Birrenkott Lt. Peterson |
| 11/15/85 | 1 hour, 30 minutes | credited for .75 hrs. based on time and a half overtime rate (worked .50 hours rather than 2 hours overtime as required) letter of reprimand dated 12/5/85 | Sgt. Birrenkott Lt. Peterson |
| 12/2/85 | 40 minutes | AWOP .67 no discipline—see letter dated 12/5/85 | Sgt. Birrenkott |
| 5/6/86 | 4 minutes | AWOP .07 1-day suspension, given 6/13/86 | Sgt. Birrenkott Lt. Peterson Lt. Hughes |
| 6/1/87 | 1 hour, 35 minutes | AWOP 1.58 letter of reprimand dated 6/26/87 | Lt. Peterson |

In her attempts to establish the City's racially discriminatory application of its tardiness policy, Sims compared her tardiness to that of Sharon Benson, a white woman employed as a parking monitor for the City of Madison. Benson had presented to the police department a physician's statement in September 1981 that indicated that she had been diagnosed as manic-depressive, a factor in her tardiness. Benson's tardiness record over the same period as Sims was the following:

| Date | Time Tardy | Disciplinary Action | Officers Involved |
|---|---|---|---|
| 10/13/80 | 30 minutes | AWOP .50 verbal counseling | Sgt. Birrenkott |
| 12/1/80 | 5 minutes | AWOP .08 verbal reprimand | Sgt. Birrenkott |
| 2/13/81 | 15 minutes | AWOP .25 verbal reprimand | Lt. Johnson |

| Date | Time Tardy | Disciplinary Action | Officers Involved |
|---|---|---|---|
| 9/12/81 | 50 minutes | AWOP .83 (physician's slip) | Sgt. Gritzmacher |
| 10/5/81 | 5 minutes | AWOP .08 verbal reprimand | Sgt. Birrenkott Lt. Johnson |
| 10/12/81 | 20 minutes | AWOP .33 documented counseling session dated 10/13/81 | Sgt. Birrenkott |
| 7/25/83 [3] | 1 hour, 45 minutes | AWOP 1.75, written reprimand (includes 8/6/83 incident) (note: Benson called in, but was denied compensatory time) | Sgt. Birrenkott Lt. Johnson Capt. Hischke |
| 8/6/83 | 2 hours, 48 minutes | AWOP 2.80 written reprimand | Sgt. Birrenkott Lt. Johnson Capt. Hiscke |
| 2/28/86 | 3 minutes | credited for 2.93 hours, based on time and a half overtime rate (worked 1.95 hours rather than 2 hours overtime as required) | Sgt. Birrenkott |

---

Sims also compared her tardiness record to that of Theresa Johnson Bultman, apparently a white woman, who had incidents of .75 hours' tardiness, 5.5 hours' tardiness and 1.75 hours' tardiness during the year 1980. There is no record of any written reprimand concerning this tardiness.

The response of the police department to Sims' June 8, 1985, tardiness is particularly significant to this case. On that date Sims did not report at her required 7:45 a.m. reporting time. Even though Sergeant Jerome Gartner, the officer-in-charge, was acting as Sims' immediate supervisor that day he was not Sims' regular supervisor and was unaware of Sims' employment history and her prior tardiness record. Because Sims failed to notify the department of her tardiness prior to her 7:45 a.m. reporting time, Sergeant Gartner asked parking monitors Debra Foster and Sharon Benson why Sims had not reported to work at 7:45. Benson told Gartner that Sims had been having some problem with oversleeping and that Sims was somewhat depressed. Gartner then telephoned Sims' residence but was unable to make contact with her. Officer John Mulcahy reported to Gartner around 8 a.m., and Gartner advised Mulcahy that Sims was absent and that he was concerned about her. Officer Mulcahy was also unfamiliar with Sims' work and tardiness records. Sergeant Gartner told Mulcahy that he would again attempt to make contact with Sims via telephone, but that if he was unable to contact her he might ask Mulcahy to check Sims' residence. At that time he gave Mulcahy the address of Sims' residence. Gartner attempted unsuccessfully to contact Sims a second time via telephone. Gartner next notified the dispatcher that Officer Mulcahy should check Sims' residence but did not request that Mulcahy enter Sims' apartment.

Upon arriving at Sims' apartment building, Mulcahy knocked on Sims' apartment door and at this time encountered Paul Anderson, the resident manager of Sims' apartment building. Anderson asked Officer Mulcahy if he could be of assistance and Mulcahy stated that Sims, an employee of the police department, had not arrived for work and that Mulcahy was attempting

**3.** Because Benson called to notify the Department prior to her tardiness, under normal Department policy the July 25, 1983, tardiness is not considered by the police department as an instance of tardiness.

to determine whether she was at home. Anderson told Officer Mulcahy that he had a pass key for the apartment and asked if Mulcahy wished to go inside Sims' apartment to verify whether Sims was present. Officer Mulcahy hesitated at first but speculated privately as to whether Sims might have been injured or ill inside the apartment and was of the opinion that a quick search of the apartment would be appropriate. Anderson unlocked the apartment door for Officer Mulcahy who entered the apartment, looked at the areas he could easily observe and departed from the premises. Officer Mulcahy neither filed a report contemporaneously nor otherwise advised others within the police department that he had entered Sims' apartment.

No evidence was presented during trial of any written Madison Police Department policy concerning the questions of dispatching officers to a tardy employee's home or entry into that employee's home. Sergeant Gartner did testify that the officer-in-charge considers the relevant circumstances in determining whether a tardy employee's residence should be checked and testified that the information he received from Parking Monitor Sharon Benson concerning Sims' present problems of oversleeping, depression and tardiness were matters he considered in directing Officer Mulcahy to check Sims' apartment. Sergeant Gartner also testified that on two separate prior occasions he had sent officers to check the residences of other tardy employees. With respect to entering a tardy employee's residence, Police Captain Thomas Hischke testified that the department follows the same legal standards (i.e., the U.S. Constitution) concerning whether an employee's residence should be entered as in the case of entry of a residence occupied by a member of the general public. For example, a residence might be entered if there were exigent circumstances justifying entry or the consent of the residence's occupant. Police Captain Thomas F. Hischke recalled that a white male police officer's residence had been entered in a case where the officer was tardy and had a history of personal problems.

Previously Sims had filed an employment discrimination charge with the Wisconsin Department of Industrial Labor and Human Relations, Equal Rights Division, on July 3, 1985, alleging that she had suffered racial discrimination in connection with the discipline for her tardiness and the entry into her dwelling. Following the City's receipt of the discrimination charge, Police Inspector Edward E. Daley requested that Police Sergeant Sylvester Combs conduct an interview with Officer Mulcahy concerning the entry of Sims' residence. Combs interviewed Mulcahy on July 14, 1985, and, in a memo to Inspector Daley, described the events of the day including his entry into Sims' apartment. In the interview, Mulcahy stated that he was in the apartment for only one minute, did not touch anything in the apartment and was interested only in checking on Sims' personal welfare. Mulcahy also stated that he had received no instructions from Sergeant Gartner to enter Sims' apartment and did so only after being approached by the apartment manager. Mulcahy further told Combs that he was of the opinion that his conduct was not in violation of the law. Inspector Daley requested that Combs conduct a second interview of Mulcahy concerning the questions of how long he was inside Sims' apartment and his actions while inside Sims' residence. In this interview, recorded in a July 19, 1985, memo, Mulcahy stated that the landlord opened the door and stood just inside the door while Mulcahy made a "cursory inspection of the apartment." Inspector Daley then requested that Combs interview Paul Anderson, the resident manager of the building in which Sims' apartment was located, as well as Sharon Benson and Debbie Foster, the two parking monitors who were also scheduled to work on the date when Sims' apartment was entered. Combs' September 3, 1985, memo to Daley contained summaries of these interviews. According to the report, Anderson stated that he observed Mulcahy ringing the doorbell to Sims' apartment and, upon learning that Mulcahy was attempting to check on Sims' welfare, told Mulcahy that he had the pass key to the apartment and would open

the door if Mulcahy wished him to do so. Anderson related that Mulcahy hesitated but then stated that as long as he was here he would make sure that nothing was wrong (concern about her physical well-being) inside the apartment. According to Anderson, Mulcahy entered the apartment, walked to the back of the apartment, looked through the door to one of the bedrooms and then exited. In Anderson's opinion, Mulcahy was not in the apartment for more than 30 seconds. Based upon his interviews Combs stated that Mulcahy and Paul Anderson had, in fact, entered Sims' apartment on June 8, 1985, and that Mulcahy and Anderson did not have Sims' permission to enter her apartment. Further, Combs concluded that Mulcahy was sent to the residence solely to contact Sims and was not sent to search the apartment. In Combs' opinion, "[t]he reason for the entry into the apartment was the fact that Anderson just happened to appear on the scene and had the master key to all the apartments" and that Mulcahy "felt that as long as he was at the scene he would ascertain that Sims was not in any danger." In conducting the investigation Combs contacted Mulcahy, Anderson and the two parking monitors but did not interview Sergeant Gartner, the officer who had dispatched Mulcahy to Sims' residence. The reason for his not interviewing Gartner was because the two sergeants' vacation schedules made a meeting difficult.

Sims further alleged that she was subject to various forms of harassment based upon her race. For example, Sims complains that Police Sergeant Birrenkott told her in March 1986 not to use the typewriters in the Administrative Services Area on her lunch hour or after hours to practice for a City typing test. Furthermore, when Sims attempted to check the anniversary date of her employment with the payroll department, the Police Chief's secretary complained to one of Sims' supervisors that Sims was "goofing off." In addition, Sims complains that "[o]n a Saturday in 1985, shortly after the June 8, 1985, entrance into my apartment by Officer Mulcahy, Sgt. Jerome Gartner told me that he 'was about to send someone out to look for

me.'" Sims also complained that she was subject to sarcastic jokes and ridicule from fellow officers after Mulcahy had entered her residence. These included statements like: "Let's go out to Sheila's house; we don't have to call first; we can just go." Sims also complained that even though she had difficulties with her radio equipment, she still received negative evaluations for her apparently tardy radio responses. Sims believes that these incidents, combined with the unequal application of the City's tardiness policies and the entry into her residence, created a racially hostile working environment.

## II.

### MULCAHY'S MOTION *IN LIMINE*

■ The district court granted Mulcahy's motion *in limine* excluding evidence during the trial relating to Mulcahy's involvement in the termination of another black parking monitor, James Washington. Washington's employment was allegedly terminated after Mulcahy wrote a memorandum stating that he had witnessed Washington's theft of 7/10ths of a gallon of gasoline. In granting Mulcahy's motion *in limine* the district court stated: "The Court doesn't believe that the circumstances involving Washington are even within hailing distances of each other. The Court believes if indeed there is anything probative as it concerns the Washington incident, again, it is outweighed by the misleading nature." On January 3, 1989, the district court made clear that the motion *in limine* related to any evidence relating to the employment, discipline and termination of Washington's employment in refusing to receive as an exhibit the memorandum Mulcahy wrote concerning Washington's gasoline theft. The Court stated:

"The Motion *in limine* was granted as it relates to Washington, and accordingly, the objection to Exhibit No. 74 would then be relevant, and Exhibit 74 would not be received as a result of the granting of the Defendant's Motion *in limine*. All the exhibits have been received, except for those which have been specifical-

ly excluded by the Court ... for relevance.... [T]he Motion *in limine* as it related to Washington was granted, and accordingly, 74 would then be excluded on the basis of relevance. The Court previously determined that if there indeed was ... relevant testimony concerning Washington, it was far outweighed by [Rule] 403 considerations, so accordingly 74 is not received if it does indeed relate to the specific motion *in limine* to which the defendant Mulcahy has referred, and defendant Mulcahy has referred to that specific incident which is inclusive of Exhibit number 74."

Sims contends that the district court erred in granting the motion *in limine* because Mulcahy's involvement in the termination of Parking Monitor Washington's employment was relevant to demonstrating the racial animus that Sims alleged motivated Mulcahy's entry of her apartment. In reviewing a district court's determination to exclude evidence upon the basis that its probative value is outweighed by its prejudicial content under Fed.R.Evid. 403, we have noted that the question of "[w]hether the probative value of evidence is outweighed by the prejudice thereof is a matter left to the sound discretion of the trial court, and we will not reverse the court's determination absent a showing of abuse of that discretion." *United States v. Field*, 875 F.2d 130, 135 (7th Cir.1989) (citations omitted). As we have also noted: "The balancing of probative value and prejudicial effect, like other comparisons of intangibles, requires an exercise of judgment rather than a computation. Only in an extreme case are appellate judges competent to second-guess the judgment of the person on the spot, the trial judge." *United States v. Krenzelok*, 874 F.2d 480, 482 (7th Cir.1989). Exclusion of evidence under Rule 403 is also important to avoid significant litigation on issues that are collateral to those required to be tried. In a previous decision upholding the exclusion of evidence under Rule 403, we stated: "In effect the admission of Lyon's testimony may have very well necessitated a 'trial within a trial' concerning Swain's alleged actions *subsequent* to, and independent of,

the assault at issue in this case and this 'trial within a trial' would have consumed a great deal of trial time and would have had slight probative value." *Jones v. Hamelman*, 869 F.2d 1023, 1027 (7th Cir.1989) (emphasis in original).

The trial judge determined that the facts involving Parking Monitor Washington's termination of employment were far afield and unrelated to the facts and circumstances in this case. Although Sims alleges that the facts of Washington's termination were relevant to establishing Mulcahy's racial hostility, the evidence would be relevant for that purpose only if the termination of Washington's employment was motivated by racially discriminatory reasons rather than the legitimate, non-discriminatory reason of gasoline theft. This determination would have effectively required a "trial within a trial" on the question of the legitimacy of Washington's termination. Because this evidence was of slight, if any, probative value, and any probative value it might have would have been established only following significant litigation within litigation concerning whether Washington's termination was motivated by discriminatory or non-discriminatory reasons, we hold that the district court's exercise of discretion was proper in granting the motion *in limine* excluding evidence concerning the termination of Parking Monitor Washington's employment.

## III.

## DAMAGES AGAINST MULCAHY

Although the jury found that Mulcahy's entry of Sims' apartment deprived Sims of her fourth amendment rights, the jury refused to grant Sims damages. Sims challenges this denial on two bases. Initially, Sims alleges that the district court's failure to provide her requested instruction concerning damages for injury to her reputation in the community resulted in an improper instruction affecting the jury's determination of compensatory damages. Secondly, Sims contends that the district court's failure to instruct the jury regarding the alleged mandatory requirement of

an award of $1 of nominal damages for her constitutional injury and its failure to amend the judgment to award her $1 in nominal damages for her constitutional deprivation was also improper.

## A.

### COMPENSATORY DAMAGES FOR COMMUNITY HUMILIATION AND LOSS OF REPUTATION

■ We turn first to the district court's refusal to give Sims' jury instruction concerning "community humiliation and loss of reputation." Sims' proposed instruction read:

"With respect to community humiliation and loss of reputation, the measure of damages is such sums as will compensate the plaintiff for the damage that has resulted from (the illegal entrance into her residence, differential application of discipline, harassment in her working environment).

It is not required that the plaintiff prove damages by any financial yardstick measuring in dollars and cents. Injury to reputation, good name, and feelings are not subject to mathematical calculations or certainty. Further, it is not necessary for the plaintiff to prove that she suffered an actual out-of-pocket loss in order to substantiate damage to her reputation and good name."

The district court refused to give this instruction, stating:

"The next item relates to those instructions which were suggested by the plaintiff which the Court finds there is no— there is legal basis for the instruction which is entitled community humiliation and the loss of reputation. None of that has been presented. There is no question that the case which has been cited— I'll also give you another one which is a prior case, *Bush [Busche] v. Burke [Burkee]*, 648 [649] F.2d 509 [ (7th Cir. 1981) ], which was cited in . . . [*Crawford v. Garnier*, 719 F.2d 1317 (1983) ]—community humiliation and loss of reputation are properly considered in determining compensatory damages 1983 claims. The Court did provide some attention to

that. Believe that and believe that it is not appropriate."

Although the court refused to provide the jury with the instruction regarding community humiliation and loss of reputation that Sims requested, it did in fact instruct the jury in detail concerning the propriety of awarding damages for any pain, suffering and mental anguish Sims allegedly suffered as a result of Mulcahy's constitutional violation. In its instruction on compensatory damages the court stated: "You should determine what sum of money will fully compensate the plaintiff for any pain, suffering and mental anguish that was proximately caused by the defendant's violation of the plaintiff's rights. These damages are known as 'compensatory damages.' " In addition, the court provided the jury with a specific instruction concerning pain, suffering and mental anguish:

"In arriving at the amount of the award you should include a sum which will compensate plaintiff reasonably for (1) any pain, suffering and mental anguish already suffered by her and proximately resulting from the action in question; and (2) any pain, suffering and mental anguish which you find from the evidence in the case that she is reasonably certain to suffer in the future from the same cause.

In this connection you may take into account, and you should take into account, plaintiff's interest and past way of life and you may allow for any loss of enjoyment of life for any emotional strain or mental suffering which you find proximately resulted from the actions of the defendant."

In the damages phase of her trial Sims presented evidence that she felt violated and humiliated as a result of the entry into her apartment. Furthermore, she testified that police department personnel publicly ridiculed her with comments like: "Let's go to Sheila's house, we don't have to call first." Sims cites no other evidence of how her reputation in the community might have suffered as a result of Mulcahy's entry into her apartment.

In a recent case involving the question of whether a court's jury instructions adequately presented every aspect of a plaintiff's civil rights claim, we observed:

"When reviewing a challenge to a jury instruction, we must view the instruction as a whole and consider the challenged instruction 'both in the context of the other instructions given and in light of the allegations of the complaint, opening and closing arguments and the evidence of record.' *General Leaseways Inc. v. National Truck Leasing Ass'n*, 830 F.2d 716, 725 (7th Cir.1987); *see also Fisher v. Krajewski*, 873 F.2d 1057, 1064 (7th Cir. 1989); *Vaughn v. Willis*, 853 F.2d 1372, 1376 (7th Cir.1988). The instructions must be construed in a ' "common sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well." ' *General Leaseways*, 830 F.2d at 725 (quoting *Wilk v. American Medical Ass'n*, 719 F.2d 207, 218 (7th Cir.1983), *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984)). Moreover, ... we must keep in mind ' "the artificiality of assuming that isolated passages in a lengthy set of instructions are apt to spell the difference between victory and defeat." ' *Id.* (quoting *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 342 (7th Cir.1985)); *see also id.* ('Just as an allegedly erroneous instruction must be viewed in the context of the full charge and other surrounding circumstances, an allegedly erroneous omission of a sentence must also be viewed in context')."

*Lynch v. Belden and Co., Inc.*, 882 F.2d 262, 267 (7th Cir.1989). We have also noted that "[r]efusal of instructions on a party's theory of the case is not reversible error if the instruction given adequately presents the party's theory." *McDonald v. Sandvik Process Systems, Inc.*, 870 F.2d 389, 395 (7th Cir.1989).

When we view the instructions in their entirety and not in isolation, it is apparent that the court's jury instruction was proper on the questions of damages based upon the "mental anguish," "loss of enjoyment of life," "emotional strain," and "mental suffering" that Sims allegedly suffered as

a result of Mulcahy's entry into her apartment. The evidence Sims presented clearly would properly be considered within the afore-mentioned categories instead of the categories of "community humiliation" or "loss of reputation." Even Sims' reaction to the kidding she received from fellow officers would appear to most appropriately be described as examples of mental anguish or emotional strain rather than as examples of community humiliation or loss of reputation within the community. Because the district court appropriately determined that there was virtually no evidence presented concerning damage to Sims' reputation and humiliation in the community and because Sims' alleged mental and emotional suffering was extensively covered in the instructions the court gave, we believe that the instructions given "adequately present[ed] [Sims'] theory," *McDonald*, 870 F.2d at 395, and that the failure to provide an instruction on community humiliation and loss of reputation does not rise to the level of reversible error.

## B.

### THE FAILURE TO AWARD NOMINAL DAMAGES

■ Sims further contends that the jury was improperly instructed and the jury committed error when it failed to return an award of $1 in nominal damages for Mulcahy's infringement of Sims' fourth amendment rights. Sims contends that an award of nominal damages is mandatory in any case where a jury has found that a constitutional right has been infringed. Thus, the jury should have been instructed that it was required to find damages and should have acted in conformity with such an instruction and awarded Sims these damages.

A review of the trial transcript demonstrates that Sims failed to raise this contention during the district court's jury instruction and special verdict conference. This conference was held on January 6, 1989, during the trial on damages. At issue during the conference was the following in-

struction relevant to both compensatory and nominal damages:

"The special verdict form that you will receive before you begin your deliberations inquires about damages.

You should determine what sum of money will fully compensate the plaintiff for any pain, suffering and mental anguish that was proximately caused by the defendant's violation of the plaintiff's rights. These damages are known as 'compensatory damages.' You are not permitted to award speculative damages. Do not include in any verdict compensation for any prospective loss which, although possible, is not reasonably certain to occur in the future.

Even if you find plaintiff is entitled to no compensatory damages, however, you may still award plaintiff nominal damages of up to $1 for the violation of her constitutional right by any individual defendant."

At the conference the court also furnished counsel for the parties with the following special verdict question applicable to both compensatory and nominal damages:

"1. What sum of money will fairly and reasonably compensate the plaintiff for any damage caused by defendant Mulcahy's unconstitutional entry into her apartment?

ANSWER: $_____"

Sims raised no objections at the conference concerning the above instruction regarding nominal damages and failed to proffer an instruction of her own on this subject. Indeed, near the end of the instruction conference Sims' attorney in fact stated:

"As it relates to the statements on the compensatory and nominal damages, *I do not think that that statement as it is in there is inconsistent with the law.* It simply indicates that the jury is entitled to award nominal damages. It doesn't say that there isn't any injury. It simply states that even if there are not compensatory damages [unclear] ..."

(Emphasis added). The court's damages instruction, after ample opportunity to object and offer another instruction in its place, was, thus, sent to the jury without objection from Sims on the subject of nominal damages.[4] Sims made one objection to the form of the special verdict question. Her attorney stated:

"I am uncomfortable with the single question because I think in this case, based on prior case law, there is (sic) several types of damages, in addition to the emotional pain and suffering, there is also the community humiliation and loss of reputation and I had included with my proposed instructions information on *Crawford v. Kramer [Garnier]*, at 719 F.2d, 1370 [1317], 1983 [ (1983) ]. It's a Wisconsin Jury Instruction that has been modified, number 2516. I think it's important for the jury to have a reasonable understanding of what types of components there are that they may be considering. I think this question tends to just lump it all as one area, and I feel that it may have the impact of short-changing. But more critically, also making it very difficult for them to deliberate as to exactly what it is they should be compensating for."

Nowhere in her objection to the special verdict was there a specific and clear objection stating that the special verdict must contain a statement that the jury was required to award nominal damages.

After the jury received the instructions and special verdict question and began their deliberations, the Court received a question from the jury regarding the special verdict. The court held a conference with the parties' attorneys that is recorded as follows:

"THE COURT: ... The Court has this question from the jury.

On question 1 [of the special verdict], is there a required minimum amount? Signed by [phonetic] Ms. Westfeld. Is there any objection to the Court an-

---

**4.** Of course, as discussed in section III–A., *supra*, Sims did object to the compensatory damages instruction solely on the basis of its failure to include an instruction regarding community humiliation and loss of reputation.

swering no and returning it to the jurors? Ms. Wagner?

Ms. WAGNER: [Sims' attorney] I would prefer that the jury instruction that included the compensatory nominal instruction be sent with the answer no.

THE COURT: Mr. Armstrong?

MR. ARMSTRONG: [Mulcahy's attorney] I agree with the Court's suggestion of the answer no without any other information.

THE COURT: Well, I think that they do deserve to give the jurors a direct answer where the question is so easily answered and that is what I am going to answer. And question number 1 is there a required minimum amount? Members of the jury, no, in answer to your question."

As the above discussion reflects, even when directly confronted with the jury's question of whether there was a required minimum amount of either compensatory or nominal damages, Sims' attorney failed to even request, much less make a specific objection on the record stating the grounds therefor, nor offer an alternative instruction that the jury be advised that there was a required minimum nominal damages amount. Sims' attorney even went so far as to agree with the court answering the jury's question, *"No."*

We recently emphasized the necessity for a party to raise any objections it might have to jury instructions prior to the time the jury begins its deliberations:

> "Rule 51 of the Federal Rules of Civil Procedure promotes judicial economy. It provides that '[n]o party may assign as error the giving or failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.' Fed.R.Civ.P. 51. The purpose of the objection is to give the trial court an opportunity to correct any errors it has made. Failure to properly object waives any challenge on appeal."

*Bob Willow Motors, Inc. v. General Motors Corp.,* 872 F.2d 788, 794 (7th Cir.1989). Not only must the party object to the jury

instruction, its "objection must be sufficiently detailed to draw the court's attention to the defect [in the jury instruction]." *Williamson v. Handy Button Machine Co.,* 817 F.2d 1290, 1295 (7th Cir.1987).

As detailed previously, Sims failed to bring to the district court's attention her contention that the jury should have been instructed that there was a mandatory requirement that nominal damages be awarded. Not only did Sims fail to bring this matter to the attention of the trial judge prior to the time the jury retired to consider its verdict, she again failed to advance, contrary to Federal Rule of Civil Procedure 51, this contention, much less the specific grounds therefor when the jury directly inquired of the court on this issue during the course of its deliberations. Indeed, Sims' attorney concurred with the court's answer that a minimum amount of damages need not be awarded. Furthermore, Sims' general objection to the combination of various damages components in a single special verdict question failed to alert and thus call to the court's attention her position that the jury was required to award some amount of nominal damages. Because Sims failed to advance any objection to the jury instructions or special verdict with the required specificity and the grounds therefor, contrary to Rule 51, she has waived her claim on appeal concerning the question of whether the jury was legally required to award nominal damages.

■ In an attempt to avoid a holding that her failure to object to the jury instructions and special verdict waived her right to challenge the jury's nominal damages verdict on appeal, Sims argues that the question of whether the law required that she receive nominal damages is a legal question that cannot be waived as a result of a party's failure to request a proper and specific jury instruction or special verdict form. Trial judges must be impartial and are neither permitted, much less obligated, to assume an adversarial position in favor of either party in attempts to remedy a party's failure to request proper and specific jury instructions. We have held that "in civil cases a plain error doctrine is not

available to protect parties from erroneous jury instructions to which no objection was made at trial." *Deppe v. Tripp*, 863 F.2d 1356, 1362 (7th Cir.1988). Furthermore, party litigants' failure to object to an instruction given to them for inspection before the instructions are given to the jury precludes them from arguing that the jury's verdict was contrary to the appropriate legal standard. In *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 675 (7th Cir.1985), we explained:

"When a party does not ask for an instruction limiting the kinds of damages the jury may award (or informing the jury of the things it must find before it may award an item of damages), we may reverse the district court's denial of a judgment NOV only if no reasonable juror could have found the evidence sufficient under the instructions it heard. If a party could argue that the evidence was insufficient under the correct legal standard, this would be an indirect method of attacking the instructions, which we have just held defendants may not do. Once the law of the case is settled by failure to object to the instructions, the parties may argue only that the jury did not play its proper part. Because the jury's part is to apply the instructions to the facts, we may scrutinize its conclusions only to find out whether it did so."

*See also Rakovich v. Wade*, 850 F.2d 1180, 1192 (7th Cir.1988) (*en banc*) ("Instructions not objected to become 'the law of the case' a limited doctrine that can affect our decision regarding a motion for judgment notwithstanding the verdict. Here if the instructions given in the district court state the law of the case for purposes of the judgment notwithstanding the verdict determination, we cannot apply law at odds with those instructions.") (citation omitted). Because Sims did not object to the court's instruction that the jury "may … award plaintiff nominal damages of up to $1 for the violation of her constitutional

right," and failed to present her own proper, tailored and specific instruction on this issue, the court's instruction was the law of the case. Especially in light of the jury's question to the court concerning whether a minimum amount of damages need be awarded and the court's answer, with all parties' consent, that no minimum amount was required, the jury clearly followed the court's instructions and acted properly in deciding not to award nominal damages. Thus, we hold that Sims' failure to challenge the jury instruction dealing with nominal damages waived her right to raise this question on appeal.[5]

## IV.

## LIABILITY OF THE CITY OF MADISON

Sims alleges that the district court should have found the City of Madison, Wisconsin, liable for violations of her rights under the fourth and fourteenth amendments to the United States Constitution, 42 U.S.C. §§ 1981 and 1983. The district court granted summary judgment in favor of the City of Madison, holding that the City was not liable for any of these alleged violations of Sims' constitutional or statutory rights.

In the district court Sims alleged that the City was responsible for constitutional and statutory violations involving discriminatory enforcement of tardiness policy, entry of her apartment and incidents of racial harassment that allegedly resulted in a racially hostile working environment. However, the record reveals that Sims failed to present any arguments dealing with the alleged racial harassment that resulted in a racially hostile working environment until her reply brief. "Because this argument was raised for the first time in the reply brief, it will not be considered." *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1295 n. 7 (7th Cir.1989). Thus, we are limited to the consideration of

---

5. In her reply brief Sims raised for the first time arguments that a new trial on damages should be ordered because the special verdict improperly confused the jury through its failure to isolate specific components of the damages available to Sims and because the jury's failure

to award nominal damages was against the weight of the evidence. "Because [these arguments were] raised for the first time in the reply brief, [they] will not be considered." *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1295 n. 7 (7th Cir.1989).

the question of whether the City can be held responsible for asserted violations of the fourth and fourteenth amendments to the United States Constitution and 42 U.S.C. §§ 1981 and 1983 resulting from the City's alleged racially discriminatory application of its tardiness policy and also its alleged responsibility for Mulcahy's entry into Sims' apartment. Although we affirm the district court's summary judgment that the City cannot be held liable for damages on these claims, we base our decision on grounds different from those relied upon by the district court. *See Patrick v. Jasper County,* 901 F.2d 561, 570 (7th Cir. 1990) ("[I]t is well settled that '[i]n appeals from summary judgment, a reviewing court may affirm on any ground that finds support in the record.'") (quoting *Donald v. Polk County,* 836 F.2d 376, 379 (7th Cir. 1988).

### A.

*City Liability Under 42 U.S.C. § 1981*

■ Sims contends that the City violated 42 U.S.C. § 1981 because of its application to her of a racially discriminatory tardiness policy and because Mulcahy's entry into her apartment was based upon racially discriminatory grounds. In *Patterson v. McLean Credit Union,* — U.S. —, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court determined that 42 U.S.C. § 1981 generally does not provide an employee with a remedy for an employer's actions that take place after an employment contract has been formed. The Court explained that the "right to make contracts" protected under 42 U.S.C. § 1981 "extends only to the formation of a contract, ... not to problems that may arise later from the conditions of continuing employment." 109 S.Ct. at 2372. The Court also explained that:

> "The right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer

after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions. Such postformation conduct does not involve the right to make a contract, but rather implicates the performance of established contract obligations and the conditions of continuing employment, matters more naturally governed by state contract law and Title VII."

*Patterson,* 109 S.Ct. at 2373. The Court also explained that section 1981's additional protection of the "rights to enforce contracts" "does not ... extend beyond conduct by an employer which impairs an employee's ability to enforce through legal process his or her established contract rights." *Id.* Both the City's alleged discriminatory tardiness policy and Mulcahy's entry into Sims' residence were employer actions that occurred significantly after the contractual relationship between Sims and the City of Madison had been formed and pertain to "the conditions of continuing employment matters more naturally governed by state contract law and Title VII" [6] and, thus, are not actionable under 42 U.S.C. § 1981 as construed in *Patterson. See also Lynch v. Belden & Co., Inc.,* 882 F.2d 262 (7th Cir.1989) (holding that racial harassment claim "based on allegations that [the plaintiff] received discriminatory job assignments and was singled out because of his race, for special treatment by his supervisor ... is not actionable under section 1981"). Therefore, Sims had no cause of action against the City of Madison under 42 U.S.C. § 1981.[7]

### B.

*City Liability Under The Equal Protection Clause Of The Fourteenth Amendment, The Fourth Amendment And 42 U.S.C. § 1983*

Sims is left with claims that the City of Madison violated the equal protection

---

6. *Patterson,* 109 S.Ct. at 2373.

7. In light of our holding that Sims failed to present actionable claims under 42 U.S.C. § 1981, it is unnecessary for us to rule upon Sims' contention that the City could be held liable for § 1981 claims under a *respondeat superior* theory. However, for the elucidation of

counsel we point out that the Supreme Court's recent decision in *Jett v. Dallas Independent School District,* — U.S. —, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), explicitly holds that a municipality may not be held liable for violations of 42 U.S.C. § 1981 under the theory of *respondeat superior.*

clause of the fourteenth amendment to the United States Constitution, the fourth amendment to the United States Constitution and 42 U.S.C. § 1983 as a result of the City's application to Sims of its allegedly discriminatory tardiness policy and Mulcahy's entry of Sims' apartment. We recently stated that:

> "In order for [Sims] to prevail on [her claims] brought pursuant to 42 U.S.C. § 1983, [she] must establish that: '(1) [she] held a constitutionally protected right; (2) [she was] deprived of this right in violation of the Constitution; (3) the defendants intentionally caused this deprivation; and (4) the defendants acted under color of [state] law.' *Donald v. Polk County*, 836 F.2d 376, 379 (7th Cir. 1988). Additionally, to hold [the City of Madison] liable under section 1983, [Sims] must demonstrate that the constitutional deprivation was caused by 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the City's] officers.' *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978); *Bergren v. City of Milwaukee*, 811 F.2d 1139, 1142 (7th Cir.1987)."

*Patrick v. Jasper County*, 901 F.2d 561, 565 (7th Cir.1990) (footnote omitted).

## 1. CITY LIABILITY UNDER THE EQUAL PROTECTION CLAUSE AND 42 U.S.C. § 1983

As stated above, an essential element of recovery under 42 U.S.C. § 1983 is the demonstration of a deprivation of a constitutionally protected right. With respect to Sims' claims under the equal protection clause of the fourteenth amendment, the district court held that there was no deprivation of a constitutional right. In the case of the allegedly discriminatory application of the tardiness policy, the district court's determination that there was no violation of equal protection was made in the summary judgment. In the case of Mulcahy's entry of Sims' apartment, the determination that the right to equal protection of the laws was not violated was made as part of the jury's verdict following trial on the issue of liability.

■ In order to establish a *prima facie* case of discrimination violative of the equal protection clause, Sims was required to demonstrate that she was treated differently from other similarly situated employees. As we held in *McMillian v. Svetanoff*, 878 F.2d 186, 189 (7th Cir.1989):

> "To establish a *prima facie* case [of racial discrimination under the fourteenth amendment] a plaintiff must show:
>
> > 'that he or she is a member of a protected class, that he or she is otherwise similarly situated to members of the unprotected class, and that he or she was treated differently from members of the unprotected class.' "

(Quoting *Collins v. State of Illinois*, 830 F.2d 692, 698 (7th Cir.1987) that quoted, in turn, *Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1307 (7th Cir.1985)). However, we have also explained that a discrimination plaintiff alleging a violation of the equal protection clause bears a heavier burden of proof than a discrimination plaintiff under Title VII:

> "Under Title VII, the petitioner must prove that she was discriminated against through disparate treatment based on an impermissible factor, or disparate impact of a neutral practice on a protected group. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973); *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335–36 & n. 15, 97 S.Ct. 1843, 1854–55 & n. 15, 52 L.Ed.2d 396 (1977); *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–32, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971). In an Equal Protection claim, the petitioner faces the tougher standard of proving purposeful and intentional acts of discrimination based on her membership in a particular class not just on an individual basis. *See generally Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976); *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Personnel*

*Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)."

*Forrester v. White,* 846 F.2d 29, 32 (7th Cir.1988) (per curiam). Thus, for Sims to demonstrate a *prima facie* case of racial discrimination under the equal protection clause, she must not only establish that she was treated differently, but she must also establish that the *"defendants acted with discriminatory intent." Webb v. City of Chester,* 813 F.2d 824, 828 (7th Cir.1987) (emphasis added). *Accord Volk v. Coler,* 845 F.2d 1422, 1430–31 (7th Cir.1988). The requirement of a demonstration of intent based upon "membership in a particular class" described in *Forrester* is more than a decision maker's simple awareness of the consequences of his or her actions. As the Supreme Court stated in *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979):

> " 'Discriminatory Purpose,' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because,' not merely 'in spite of' its adverse affects upon an identifiable group."

(Citation and footnotes omitted). Examples of facts sufficient to demonstrate intent found in employment discrimination cases we have decided under the equal protection clause include allegations of a police commissioner's statement that "a woman has no business being a police officer," *Webb v. City of Chester,* 813 F.2d at 829, and statements that a defendant desired to "discourage women from applying for the position because he wanted to hire a man for that position," and that the plain-

tiff "need not apply for [the position] because they were going to hire a man for that position." *Van Houdnos v. Evans,* 807 F.2d 648, 652 (7th Cir.1986).[8] If a *prima facie* case of racial discrimination under the Equal Protection Clause is established,

> "the burden then shifts to defendants to articulate a legitimate non-discriminatory reason for taking the action alleged by plaintiff to be discriminatory. If defendants do articulate such a reason, the burden then shifts back to plaintiff to demonstrate that the proffered reason is merely a pretext for discrimination."

*Webb,* 813 F.2d at 828.

### a.

City Liability For Application Of The Alleged Discriminatory Tardiness Policy Under The Equal Protection Clause And 42 U.S.C. § 1983

■ The district court granted the City's motion for summary judgment determining that the City did not violate the equal protection clause in its application of its tardiness policy to Sims. "Summary judgment is properly entered in favor of a party when the opposing party is unable to make a showing sufficient to prove an essential element of a case on which the opposing party bears the burden of proof." *Common v. Williams,* 859 F.2d 467, 469 (7th Cir.1988). As the Supreme Court noted: "In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of a non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In reviewing whether a non-party has established a required ele-

---

**8.** A *prima facie* case of an Equal Protection Clause violation under 42 U.S.C. § 1983 would also require a demonstration that the alleged deprivation was "under color of state law." In the case of municipal liability this would require a demonstration that the constitutional violation was "pursuant to official municipal policy of some nature." *Webb v. City of Chester,* 813 F.2d 824 (7th Cir.1987). However, because Sims' case is decided upon the issue of whether she established a violation of the equal protection clause, it is unnecessary to determine whether she demonstrated that the City's actions were pursuant to a municipal policy. *See Mark v. Furay,* 769 F.2d 1266, 1271 (7th Cir.1985) ("The question of whether a municipality *caused* a constitutional deprivation does not even arise absent proof that a deprivation in fact occurred.") (emphasis in original).

ment of its case in a manner sufficient to avoid summary judgment, we remind party litigants that:

> "[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party must do more than simply 'show there is some meta-physical doubt as the material facts.' *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted). 'Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." ' *Id.* at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968))."

*Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir.1988) (emphasis in original).

In order to demonstrate a violation of the equal protection clause with respect to the City's application of its tardiness policy, Sims was required to demonstrate that she was treated differently from other similarly situated employees. As the district court determined, Sims had compiled "*a record of tardiness unrivaled by any of her co-workers.*" *Sims v. City of Madison*, No. 88–C–524, Memorandum and Order on Summary Judgment at 17 (W.D.Wis. December 19, 1988) (emphasis added). In determining that Sims had failed to establish that the treatment she received was different than that received by similarly situated white employees, Benson in particular, the district court conducted an extensive review of Sims' attempts to compare her record to that of a white employee, Sharon Benson:

> "A review of the incidents of tardiness reveals that plaintiff had a record of tardiness unrivaled by any of her co-

workers. Plaintiff principally relies upon the comparison of her record of discipline to that of Sharon Benson, a white employee. The Court does not find such a comparison to support differential discipline. The plaintiff's record of tardiness includes 15 incidents between April 1980 and June 1987. Sharon Benson's record indicates nine incidents during the same period.

> The plaintiff was tardy on seven occasions in 1980. She received a verbal reprimand after the fifth tardiness and a letter of reprimand after the seventh. Sharon Benson was tardy on six occasions in 1980 and 1981. She received a verbal reprimand after the second, third and fifth tardiness. The Court believes that the noted verbal reprimands received by Sharon Benson are, if anything, more severe than those received by Sheila Sims.

> In 1983 Sharon Benson was tardy on two occasions and received a written reprimand. She had only one other tardiness in February 1986 for three minutes, for which she was not reprimanded. In contrast to Benson's three incidents following the initial incidents in 1980 and 1981, the plaintiff's tardiness continued. In 1982 and 1984 plaintiff was tardy and received a verbal reprimand. In 1985 plaintiff was tardy four times and received one verbal and one written reprimand. In 1986, when plaintiff was tardy for the third time in six months, she received a one-day suspension, and in 1987 she was tardy and received a letter of reprimand.

> There is no question that the plaintiff received more discipline than other employees for her tardiness. There is also no question that her record for tardiness was not comparable to other employees. The discipline received by Sharon Benson seems entirely commensurate with her level of tardiness and does not demonstrate a more lenient treatment under the circumstances. Accordingly, the Court finds that the plaintiff has failed to establish a *prima facie* case of discriminatory discipline."

*Id.* at 17–18. We agree with the district court's analysis. Sims has failed to demonstrate that she was disciplined more severely than similarly situated white employees. Any differences between the discipline Sims received and the discipline other employees similarly situated received resulted from the differences in their respective tardiness records. In light of these facts, we agree that a reasonable trier of fact could not have determined that Sims met her burden of demonstrating that she was treated differently from other similarly situated employees.[9]

Not only did Sims fail to demonstrate that she was treated differently than similarly situated white employees, she also fell far short of establishing the required element of discriminatory intent. The record appears devoid of any example of evidence revealing that Sims' race was considered in any manner in the City's discipline of Sims for her tardiness. The record certainly contains no examples of the types of express discriminatory statements or actions found sufficient to satisfy the element of discriminatory intent in our earlier decisions in *Webb* and *Van Houdnos.* Thus, because the allegations Sims presented were insufficient for a reasonable factfinder to conclude that she had established either the element of differential treatment or intentional discrimination required to demonstrate a *prima facie* case of racial discrimination under the equal protection clause, we conclude that the district court acted properly in determining that there was no deprivation of Sims' rights under the equal protection clause resulting from the City's application to Sims of its tardiness policies.

b.

City Liability For Mulcahy's Entry Of Sims' Residence Under The Equal Protection Clause And 42 U.S.C. § 1983

 Following trial the jury rendered a verdict finding that Sims was not deprived of rights under the Equal Protection Clause as a result of Mulcahy's entry of her apartment. Specifically, the jury found that Sims was not "treated differently from non-minority persons by virtue of defendant Mulcahy's entry into her apartment on June 8, 1985." Sims has never challenged in the district court or on appeal the sufficiency of the evidence underlying the jury's verdict on this issue. Furthermore, the evidence in the record that Mulcahy was unfamiliar with Sims' employment record, including her tardiness, and entered Sims' residence only out of concern for her safety, health and possible injury when viewed in the light most favorable to Mulcahy, provides the "sufficient probative basis upon which a jury could reasonably reach a verdict"[10] that would be necessary to withstand any sufficiency of the evidence challenge. Thus, Sims has failed to establish a violation of federal equal protection clause rights resulting from Mulcahy's entry of Sims' apartment. Because demonstration of an equal protection clause violation in Mulcahy's entry of her apartment was an element essential to Sims' attempt to hold the City liable for an alleged Equal Protection Clause violation under 42 U.S.C. § 1983, the absence of any deprivation of equal protection of the laws is fatal to this claim.

2. CITY LIABILITY UNDER THE FOURTH AMENDMENT AND 42 U.S.C. § 1983

 The jury found that Mulcahy had violated Sims' fourth amendment rights in his entry of her apartment. In order to hold the City of Madison liable for this constitutional violation, it was necessary for Sims to demonstrate that the constitutional deprivation was rooted in municipal policy or custom, in other words "caused by 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the City's] officers.'"

---

9. We also agree with the district court's conclusion that Sharon Benson's health problems were a legitimate, non-discriminatory and non-pretextual basis for any differences in treatment that might have occurred in the cases of Sims and Benson.

10. *Anderson v. Gutschenritter,* 836 F.2d 346, 348 (7th Cir.1988).

*Patrick,* 901 F.2d at 565 (quoting *Monell,* 436 U.S. at 690, 98 S.Ct. at 2036). As the Supreme Court has noted, "our first inquiry in any case alleging municipal liability under § 1983 is the question of whether there is a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989).

One basis for establishing the necessary causal link between municipal policy and the alleged constitutional deprivation would exist if the decision to enter Sims' apartment was a result of "a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Zook v. Brown,* 865 F.2d 887, 895 (7th Cir.1989). However, both Officer Mulcahy and Sergeant Gartner, the only individuals even arguably responsible for the constitutional violation, were both subordinate police officers who clearly were not invested with any final policy making authority dealing with the entry of Sims' apartment.[11] Thus, if municipal liability is to be legally established pursuant to case law, it must be grounded upon another basis.

The City could also be held liable for damages under *Monell* if Sims could demonstrate that the decision to enter her residence was made pursuant to official policy. But, the evidence establishes that the City's formal official policy with respect to the entry of employee residences was to require officers to conform to the limitations the Constitution places upon the entry of any private home and that there was not even an order given for Mulcahy to enter the apartment, much less a departmental practice to enter employee residences in similar circumstances. However, the nonexistence of a formal policy does not preclude the existence of a custom or practice of unconstitutional entry of employee residences that could provide a basis for municipal liability. As we observed in *Gray v.*

*Dane County,* 854 F.2d 179, 183 (7th Cir. 1988):

"This limitation on municipal liability has required the courts to determine whether particular actions by municipal employees, undertaken without formal authorization, can implicate the municipality by establishing the existence of an entrenched practice with the effective force of a formal policy. This court has held that 'the isolated, intentional acts of an officer [without authority to set municipal policy] do not establish municipal liability under section 1983,' *Rodgers* [*v. Lincoln Towing Service, Inc.,* 771 F.2d 194, 202 (7th Cir.1985)], and has repeatedly affirmed dismissals of section 1983 claims that seek to impose municipal liability based on such isolated acts. However, 'where the plaintiff alleges a pattern or a series of incidents of unconstitutional conduct, ... the courts have found an allegation of policy sufficient to withstand a dismissal motion.' *Powe v. City of Chicago,* 664 F.2d 639, 650 (7th Cir.1981)...."

(Citations and footnotes omitted). This type of practice, although lacking formal approval, can provide a basis for municipal liability since

"governmental customs, in contrast to official policies, do not receive 'formal approval through ... [the local government's] official decision making channels,' *Monell v. Dept. of Social Services,* 436 U.S. at 690–691, 98 S.Ct. at 2036; rather, they are simply ' "persistent and widespread ... practices of officials." ' *Id.* at 691, 98 S.Ct. at 2036. The word 'custom' generally implies a habitual practice or a course of action that characteristically is repeated under like circumstances."

*Jones v. City of Chicago,* 787 F.2d 200, 204 (7th Cir.1986) (citation omitted).

Sims does not allege that there was a widespread practice of unauthorized and unconstitutional entry of employee residences capable of establishing a custom sufficient to support a conclusion of municipal liability. *See Gray,* 854 F.2d at 184

---

11. It should also be noted that Mulcahy was never ordered to enter Sims' residence.

("The offending officials clearly were not conforming to informal practices ' "so permanent and well settled as to constitute a 'custom or usage' with the force of law." ' ") (Quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (plurality opinion) that quoted, in turn, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1614, 26 L.Ed.2d 142 (1970)). Rather, her position is that the City should be held liable because it failed to monitor its employees' entry into other employees' residences due to the absence of procedures for the notification of the police department when an employee entered another employee's residence and because it failed to properly investigate incidents where the entry of an employee's residence occurred. In *Jones v. City of Chicago*, 787 F.2d 200, 204–205 (7th Cir.1986), we extensively considered the evidence necessary to demonstrate municipal liability on the basis of alleged inaction in response to unconstitutional misconduct on the part of the municipality's employees:

> "[I]naction in response to [the] misconduct of its employees may result in municipal liability but only where the injury is caused by 'faults "systemic in nature," ' *Strauss v. City of Chicago*, 760 F.2d 765, 770 (7th Cir.1985), citing *Powe v. City of Chicago*, 664 F.2d 639, 651 (7th Cir.1981); the isolated act of an employee generally is not sufficient to impose municipal liability. *See Monell v. Dept. of Social Services*, 436 U.S. at 694, 98 S.Ct. at 2037 (a municipality cannot be held liable solely because it employs a tortfeasor); *Cf. Pembaur v. City of Cincinnati*, 475 U.S. 469, 470, 106 S.Ct. 1292, 1293, 89 L.Ed.2d 452 (1986) ("Municipal liability may be imposed for a single decision by municipal policy makers under appropriate circumstances"); *Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 284 (7th Cir.1986) (single act of high-level policy maker can render local government liable under Section 1983). Further, in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable. *See, e.g., Avery v. County of Burke*, 660

F.2d 111, 114 (4th Cir.1981); *Murray v. City of Chicago*, 634 F.2d 365, 366–67 (7th Cir.1980) (failure of responsible officials to establish appropriate procedures for the prevention of serious malfunctions in the administration of justice implicates dereliction of duty of constitutional dimension for which municipality may be held liable under Section 1983), *cert. granted sub nom. Finley v. Murray*, 454 U.S. 962, 102 S.Ct. 501, 70 L.Ed.2d 377, *cert. dismissed*, 456 U.S. 604, 102 S.Ct. 2226, 72 L.Ed.2d 366. We take [*City of Oklahoma City v. Tuttle*] [471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)] 'affirmative link' requirement to mean that there must be some knowledge or an awareness—actual or imputed—of the custom and its consequences showing the municipality's approval, acquiescence or encouragement, or the alleged unconstitutional violation.

Further, the quantum of evidence needed is considerably greater where, as here, the particular customs that appellants claim resulted in their injuries involve a course of municipal inaction that is a good deal removed from the constitutional deprivation alleged. A plaintiff that faults a municipality's inaction must show that there is an 'extremely high degree' of municipal culpability. *Lenard v. Argento*, 699 F.2d 874, 885 (7th Cir.1983), *cert. denied*, 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84; *cf. Strauss v. City of Chicago*, 760 F.2d at 769 (inaction that is 'significantly egregious' may render municipality liable for single injury under section 1983). As the district court stated below:

> 'No municipality may be held liable for its indifference to the mere *possibility* of a constitutional violation. Rather, the plaintiff must prove the municipality was aware either of actual deprivations or such a strong likelihood of imminent (though unrealized) deprivations that any reasonable person would have taken preventative measures.'

*Jones v. City of Chicago*, 608 F.Supp. [994, 1000 (N.D.Ill.1985)] (emphasis in original). Where the custom itself does not establish wrongdoing, there must be

evidence of a course of events or circumstances that permit an inference of deliberate indifference or tacit authorization of the offensive acts. *See Lenard v. Argento,* 699 F.2d at 886."

(Citation omitted).

Turning first to Sims' claim that the City should be liable for its inaction in failing to require that it be notified after the fact of an employee's entry of another employee's residence, we have difficulty discerning "a course of events or circumstances that permit an inference of deliberate indifference or tacit authorization of the offensive acts." *Jones,* 787 F.2d at 205. As we noted in *Jones,* 787 F.2d at 205, a plaintiff must demonstrate that " 'the municipality was aware either of actual [constitutional] deprivations or of such a strong likelihood of imminent (though unrealized) deprivations that any reasonable person would have taken preventative measures.' " (Quoting *Jones v. City of Chicago,* 608 F.Supp. at 1000). There is nothing in this record even coming close to demonstrating a widespread custom or practice of entry into employee residences under similar circumstances of which the City was aware. Furthermore, the record fails to establish any facts from which it could be argued that there was "such a strong likelihood of imminent (though unrealized) deprivations that any reasonable person would have taken preventative measures." In light of this factual situation, we refuse to hold that the City's inaction with respect to the requirement of notification when an employee enters another employee's residence constituted the "deliberate indifference or tacit authorization of the offensive acts," *Jones,* 787 F.2d at 205, required for a holding of municipal liability based upon a city's inaction in response to its employees' misconduct.

■ Similarly tenuous is Sims' argument that municipal liability should arise because of the City's failure to conduct an adequate investigation of Officer Mulcahy's entry of her apartment. In fact, the record reveals that the City did make a satisfactory investigation of this incident through the efforts of Sergeant Sylvester Combs under the close supervision of Inspector Edward Daley. Inspector Daley even requested Combs to conduct follow-up interviews with Officer Mulcahy, Apartment Manager Paul Anderson, and two of Sims' fellow parking monitors following Combs' initial interview of Mulcahy. Although it is possible that the City could have conducted a more thorough investigation that would have included an interview with Sergeant Jerome Gartner, we are not of the opinion that a City investigation that included interviews with various relevant individuals over a three-month period constitutes the "deliberate indifference or tacit authorization of the offensive act," [12] necessary to establish municipal liability based upon inaction in response to the misconduct of its employees.[13]

The absence of allegations sufficient to establish a "direct causal link between a municipal policy or custom, and the alleged constitutional deprivation," *City of Canton,* 109 S.Ct. at 1203, most clearly demonstrates that Sims has failed to present factual allegations "sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In light of this situation "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial," and the City "is 'entitled to a judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the

---

**12.** *Jones,* 787 F.2d at 205.

**13.** Sims also alleges that the failure to order a satisfactory investigation of the entry of her apartment was racially discriminatory and the result of the City's failure to train its employees in facially neutral management techniques.

This attack fails in light of Sims' inability to demonstrate how more thorough investigations of constitutional violations occurred in the cases of white employees who alleged constitutional deprivations at the hands of City officials.

burden of proof." *Id.* at 323. Thus, we affirm the district court's grant of summary judgment in favor of the City of Madison, Wisconsin, on the issue of municipal liability for damages under 42 U.S.C. § 1983 resulting from Mulcahy's violation of the fourth amendment in entering Sims' residence.

## V.

### MULCAHY'S CROSS–APPEAL ON THE QUALIFIED IMMUNITY ISSUE

 Although the district court granted judgment wholly in favor of Mulcahy, dismissing Sims' complaint with prejudice, Mulcahy has cross-appealed from this favorable judgment. In *Byron v. Clay*, 867 F.2d 1049, 1050–51 (7th Cir.1989), we explicitly held that a cross-appeal was improper and unnecessary in such circumstances. We observed:

> "The cross-appeal is improper. The district court's judgment is entirely in the defendant's favor, and you can't appeal from a judgment entirely in your favor. The defendants are simply advancing additional arguments in support of the judgment, and this they can do perfectly well in the answering brief. A cross-appeal is an *appeal* and therefore in order only when a party wants to change (even if only conditionally) the trial court's judgment. We repeat our admonition against the filing of unnecessary cross-appeals."

(Citations omitted, emphasis in original). We spoke even more emphatically on this issue in *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 439 (7th Cir.1987):

> "The cross-appeal was unnecessary. A party may support a judgment in its favor with any argument preserved in the district court. Cross-appeals for the sole purpose of making an argument in support of the judgment are worse than unnecessary. They disrupt the briefing schedule, increasing from three to four the number of briefs, and they make the case less readily understandable to the judges. The arguments will be distributed over more papers, which also tend to be longer. Unless a party requests the

alteration of the judgment in its favor, it should not file a notice of appeal."

(Citation omitted). *See also City of Milwaukee v. Yeutter*, 877 F.2d 540, 543 (7th Cir.1989) ("Reminders, e.g., *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 439 (7th Cir. 1986), that prevailing parties need not file cross-appeals to make arguments in defense of their judgments seem to fall on deaf ears.").

Because we have affirmed the judgment rendered in favor of Mulcahy, it is unnecessary, and we refuse, to reach the issue of whether the district court should have dismissed the action against Mulcahy on the alternative ground of qualified immunity. We award costs to the defendants-appellees and request that they file a statement of costs for our perusal. The district court's judgment is

Affirmed.