**Richard CROSS, Plaintiff,**

v.

**ROADWAY EXPRESS, Defendant.**

No. 93 C 2584.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 18, 1994.

---

Charles F. Smith, Chicago, IL, for plaintiff.

Edward C. Jepson, Jr., Thomas G. Hancuch, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Richard Cross ("Cross") has sued his employer Roadway Express, Inc. ("Roadway"), asserting that a series of disciplinary letters issued to Cross reflect racial discrimination in violation of both Title VII of the 1964 Civil Rights Act ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). Roadway has moved for summary judgment under Fed. R.Civ.P. ("Rule") 56, and all of the parties' memoranda and supporting materials are now in hand.[1] Based on this Court's review of the parties' submissions and for the reasons stated in this memorandum opinion and order, Roadway's motion is granted and this action is dismissed.

### Summary Judgment Principles

Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the

---

1. This District Court's General Rule ("GR") 12(m) facilitates resolution of Rule 56 motions by requiring every movant to submit statements of assertedly uncontested facts with *citations to the record* in support of each, to which GR 12(n) requires every nonmovant to respond point by point, with citations to the record in support of (1) any claimed contest of the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert. Citations to the GR 12 statements here will take the respective forms "D. 12(m) ¶ —", "P. 12(n)(1) ¶ —" and "P. 12(n)(2) ¶ —". Where Cross has admitted any D. 12(m) statement, either no record citation will be given or only that document will be cited. And where Roadway disputes any P. 12(n)(2) statement, this Court will adhere to the principles set out in the next paragraph of the text.

record—only those inferences that are reasonable"—in the light most favorable to non-movant Cross (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). While "this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th Cir.1992)), that does not foreclose the potential for summary judgment in such cases (*Washington v. Lake County*, 969 F.2d 250, 254 (7th Cir.1992)). Moreover, "a plaintiff facing the prospect of summary adjudication cannot 'sit back and simply poke holes in the moving party's summary judgment motion'" (*Young In Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993)). This opinion turns first to the evidentiary facts, then will proceed to the application of the just-stated principles.

### Facts

Roadway is a transportation company with facilities nationwide, including one in Chicago Heights, Illinois (the "Facility") that comprises a terminal to which freight is delivered and a relay through which it is dispatched. Approximately 700 people are employed in the relay portion of the Facility, about half of whom ("drivers") are responsible for hauling freight between various Roadway depots via semi-tractor-trailer units. Drivers are overseen by driver supervisors and by line haul dispatchers ("dispatchers"), with the dispatchers also having responsibility for parceling out the drivers' work assignments.

Cross (who is black) worked off and on as a driver assigned to the Facility from July 28, 1984 until May 17, 1992, since which time he has been on personal sick leave. Like other Chicago–Heights–based drivers, Cross was a member of the bargaining unit represented by Local 710 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Union").

**2.** By framing the time calculation in those terms, the Labor Guide sets up constantly rolling periods of review.

**3.** There is a lot to be desired in the way the Labor Guide is drafted in this area—its literal

Roadway has promulgated a well-defined and documented attendance policy governing its drivers' availability—or unavailability—to receive work assignments. Its Road Driver's Manual (the current version of which was first issued in 1986) provides:

### Reporting for Duty

Under the hours of service regulations, you must be given a rest period of at least eight hours before you are recalled to duty. After eight hours, you are responsible for being available to receive a duty call. Unavailability is cause for disciplinary action.

When the dispatcher makes the duty call, he or she will instruct you when to report for work. Two hours' advance notice is usually given. Failure to report for work after a duty call will result in a loss of earnings, and may result in disciplinary action.

Drivers who are disabled for an extended period are eligible for two kinds of leaves of absence: a workers' compensation leave of absence if the disability is work-related and a personal medical leave of absence if it is not. Drivers are also permitted five additional sick days per year pursuant to the collective bargaining agreement ("CBA") negotiated between Roadway and Union.

Roadway's Labor Guide sets out guidelines for handling all personnel matters, including discipline. One of the primary areas of offense is absenteeism—"unexcused absences"—defined as (1) unavailability for dispatch and (2) failure to report for a run that a driver has accepted. Two unexcused absences within any 60 calendar days [2] constitute a first "offense." Both the first offense and the second offense trigger warning letters. Any third offense calls for a suspension. Still a fourth offense reverts to the issuance of one last warning letter. And the fifth offense calls for discharge of the offending employee.[3]

language sounds as though the cumulation of offenses carries through a driver's entire tenure with Roadway, so that a driver might be discharged for five very widely spaced unexcused absences. But that reading is entirely inconsistent with some employees' accumulations of

In addition to absenteeism, Roadway drivers are subject to discipline for a variety of other matters. Roadway's practice is to assign a running time between its facilities, and drivers who arrive more than ".50 clicks" (a half-hour) after the assigned time are subject to discipline for delay of freight, absent extraordinary circumstances such as severe weather. Drivers can also be rebuked formally for failure to turn in their daily logs as required by Department of Transportation rules.

From November 1987 through December 1992 Mike Lamphere ("Lamphere") served as the Chicago Heights relay manager, in which capacity his responsibilities included reviewing prospective disciplinary actions before they were issued.[4] That chore included an investigation of the documentation supporting the proposed discipline as well as a review of the accused driver's overall record. Roughly 10 to 25 proposed disciplinary letters typically made their way across Lamphere's desk each week, a total reflective of the fact that supervisors and dispatchers were apparently not very shy about writing people up. Indeed it was not uncommon for a driver with several years' experience to have received more than a dozen written warnings—and as the later discussion reflects, at least one white driver (whom Cross unsuccessfully points to as having been treated more favorably) has been tagged with fully 35 disciplinary measures for unautho-

rized absences during his time with Roadway.

### Cross' Claims

Complaint ¶ 9 alleges racial discrimination in the form of harassment by Roadway "with the intent of terminating [Cross] or making him quit." Underlying both his Title VII and Section 1981 claims are a number of disciplinary letters issued to Cross by Roadway for various reasons, the most common being absenteeism.[5] Cross contends that those marks against his record were undeserved and that the decisions to discipline him were actually motivated by his race. In support of that claim Cross says that other white drivers were treated more leniently.

■ *Mojica v. Gannett Co.,* 7 F.3d 552, 561 (7th Cir.1993) (en banc) has succinctly mapped out Cross' task here:[6]

In any discrimination case, the plaintiff bears the ultimate burden to prove, by a preponderance of the evidence, that his employment was adversely affected by his protected class status. *Kizer v. Children's Learning Center,* 962 F.2d 608, 611 (7th Cir.1992); *Oxman v. WLS–TV,* 846 F.2d 448, 452 (7th Cir.1988). The plaintiff can meet this burden either by presenting direct evidence of discrimination, *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111 [105 S.Ct. 613, 83 L.Ed.2d 523] (1985), or by successfully navigating the course of

---

large numbers of warning letters, as referred to later in this opinion—something that would imply that discharge can occur only if five such "offenses" are committed in the same 60–day period. In any event, the opaque nature of the Labor Guide in that respect makes no difference in the outcome here (though it certainly affects what is at risk for any repeat offender).

**4.** After any stage of discipline, drivers who felt they were *reprimanded unfairly* could pursue any of four options: (a) do nothing; (b) present their case directly to Lamphere; (c) submit a letter of rebuttal; or (d) file a grievance pursuant to the CBA. Cross acknowledges that Lamphere sometimes lessened the force of disciplinary letters or withdrew them completely if a driver or Union representative successfully presented a case for doing so (P. 12(n)(1) ¶ 33). Although he admits that he never pursued any of his gripes with Lamphere personally, Cross says he was never told he could do that (*id.* ¶ 34).

**5.** All but two of the charged episodes antedated November 21, 1991, the effective date of the statutory amendment intended to reverse the decision in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) by making actionable under Section 1981 any "racial harassment relating to the conditions of employment" (*id.* at 171, 109 S.Ct. at 2369) of the sort at issue here. Roadway itself was the prevailing party in the recent Supreme Court decision (*Rivers v. Roadway Express, Inc.,* —— U.S. ——, ——–——, 114 S.Ct. 1510, 1514–20, 128 L.Ed.2d 274 (1994)) that has held the 1991 amendment inapplicable to pre-enactment conduct. Thus virtually all of Roadway's challenged conduct drops out for Section 1981 purposes.

**6.** Disparate treatment claims such as Cross' are subject to the same burdens of proof and production under both Title VII and Section 1981 (*Von Zuckerstein v. Argonne Nat'l Lab.,* 984 F.2d 1467, 1472 (7th Cir.1993)).

shifting burdens authorized in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668] (1973). *See also St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742 [125 L.Ed.2d 407] (1993).

Because Roadway offers nothing that can be characterized as direct evidence of unlawful discrimination (as described in *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736–37 (7th Cir.1994)), he—like most discrimination plaintiffs—must look to circumstantial evidence (*id.* at 736–37), most often considered through the *McDonnell Douglas* methodology (see, most recently, *Timm v. Mead Corp.,* 32 F.3d 273, 275, (7th Cir.1994)).

■ Under that well-established framework Cross must first establish a prima facie case [7] "by showing that: (1) he belongs to some protected class, (2) he performed his job satisfactorily, (3) he suffered an adverse employment action, and (4) his employer treated similarly-situated employees outside his class more favorably" (*Hughes v. Brown,* 20 F.3d 745, 746 (7th Cir.1994)). That showing would in turn create a presumption of unlawful discrimination and would thus shift the burden to Roadway to advance a "legitimate, nondiscriminatory" explanation for the adverse employment action (*St. Mary's Honor Center,* —— U.S. at ——– ——, 113 S.Ct. at 2746–47). If Roadway did that, Cross would bear the burden of showing that Roadway's proffered explanation was merely pretextual (*id.*).

Like many other cases, this one illustrates the practical difficulties in separating out the various components that make up employment discrimination analysis. For example, any examination of Cross' prima facie attempt to establish his own satisfactory job performance necessarily overlaps with the analysis of whether Roadway stated explanation for disciplining Cross (based on his *unsatisfactory* job performance) was pretextual. In the same way, the inquiry into the fourth prima facie element (allegedly less favorable treatment accorded to Cross) meshes inextricably with Cross' attempt to demonstrate pretext by identifying similarly-situated but better-treated non-blacks.

■ But there is no need to get caught up in such conceptual concerns. After all, *McDonnell Douglas* is not intended to prescribe an ironbound formula. It rather furnishes a useful device to assist in getting to the bottom of the matter—as *Loyd v. Phillips Bros., Inc.,* 25 F.3d 518, 521 (7th Cir. 1994) put it:

> Sometimes, however, too rigid adherence to the formulaic prescriptions of the appellate courts (which are laid out with particular factual settings in mind and are seldom as generalizable as purported) blocks proper analysis of what should be uncomplicated issues of discrimination.

As has been done in such cases as *Holmberg v. Baxter Healthcare Corp.,* 901 F.2d 1387, 1391 (7th Cir.1990), this opinion focuses from the outset on the proposition that Cross cannot survive the present motion unless he can create a genuine factual issue as to whether Roadway's stated reasons for disciplining him were really pretextual.

Roadway's proffered explanations for disciplining Cross are his habitual unavailability, his occasional late arrivals and his failure to comply with company rules relating to his log book.[8] In arguing that his performance was in fact up to snuff (and relatedly that Roadway's stated reasons were pretextual), Cross urges that there was no reasonable basis for disciplining him. But even the most cursory

---

7. In the present summary judgment context, of course, Cross need not "establish" or "prove" anything. Instead his lesser burden is to create a genuine factual issue (after having been given the benefit of reasonable inferences) as to each of the substantive areas dealt with in this opinion. That is the standard applied throughout this opinion, even though it may often employ the more stringent-sounding language to avoid awkward repetition of the "genuine issue" phraseology and to mirror the discussion in the principal cases in the area.

8. Cross does not deny that the violations *ascribed* to him allowed the punishment meted out by Roadway under its operative rules (thus employers' adverse actions based on similar conduct have been upheld as nonpretextual in such cases as *Bush v. Commonwealth Edison Co.,* 990 F.2d 928, 931 (7th Cir.1993)).

review of the record reveals that position to be totally devoid of merit.

Cross' overall attendance record (or more precisely his nonattendance record) is really astonishing. Out of the almost exactly 10 years of his employment by Roadway, he has missed about two-thirds (a total of some 6½ years) because of workers' compensation leaves (indicated by "WCL") and personal sick leaves (designated "PSL"):

- February 22, 1985 to April 8, 1985 (WCL)
- April 13, 1985 to June 5, 1985 (WCL)
- June 23, 1985 to August 1, 1988 (WCL)
- November 9, 1988 to January 30, 1989 (WCL)
- January 30, 1989 to February 24, 2989 (PSL)
- October 8, 1989 to March 10, 1990 (PSL)
- July 1, 1990 to September 4, 1990 (WCL)
- May 17, 1992 to the present (PSL)

Those excused absences do not of course support any disciplinary action, although they may make it more difficult for Roadway to plan on matching its business needs with its available personnel. But Cross' file also reflects a host of citations documenting multiple instances of his unexcused unavailability for service (all admitted in Cross' GR 12(n)(1) statement). On each of those occasions a disciplinary letter was issued after Cross had either taken himself out of service after accepting a work call or had refused to receive a dispatch in the first place. Roadway has clearly documented each of those violations, as well as Cross' two admittedly late arrivals and an admitted failure to turn in his daily log on one occasion.

Cross primarily attempts to discredit Roadway's disciplinary explanations by contesting the soundness of its decisions to issue the sanctions. As to the many instances of his unexcused unavailability, for example, Cross cites various mitigating circumstances that he insists absolve him in some of those situations—factors such as doctors' notes (D. 12(m) ¶¶ 49, 65, 66, 88, 89), illnesses that, though not necessarily medically substantiated, nonetheless in his judgment prevented him from driving safely (P. 12(n)(2) ¶¶ 5A–10A), his father's heart attack (*id.* ¶ 3A) and

Union business (D. 12(m) ¶¶ 51–57). Cross also challenges the charges of late arrival, contending that his tardiness stemmed from obligatory but time-consuming pre-trip inspections (P. Mem. 7). Finally Cross contests Roadway's characterization of the log incident as a violation of policy, referring to a letter that he wrote two weeks later (D. 12(m) ¶ 113):

> If a log was not turn [sic] in on the 25th, it could have been turned in at 1400 the next day. Must a person make a special trip to turn in a log when he will be coming to work in a short while?

But it is not this Court's role to referee such disputes. Instead it is enough to note that Cross' efforts to turn those quarrels into a showing of prohibited race discrimination are entirely misguided. Of course Roadway was and is entitled to enforce a reasonable, clearly-expressed and time-tried set of rules and procedures (particularly one that ensures employees an opportunity to defend themselves), and this Court is not about to jump in to overrule its supervisors' determinations. As our Court of Appeals has said again and again (although often ringing different locutionary changes on the same theme), no court may "sit as a super-personnel department that reexamines an entity's business decisions" (*Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 151 (7th Cir. 1994); and see a myriad of other cases such as *Timm*, 32 F.3d at 275–276; *Kralman v. Illinois Dep't of Veterans' Affairs*, 23 F.3d 150, 156 (7th Cir.1994); *McCoy*, 957 F.2d at 373; *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988); *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir.1987); and *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986)).

Instead of urging this Court to examine and resolve in his favor the factual disputes underlying various of the incidents in question (something that would not contribute to the analysis of race-based discrimination vel non), Cross would fare far better if he could point to other similarly-situated but non-black drivers who were not similarly disciplined for comparable conduct. That is of course the classic form of circumstantial evi-

dence of discriminatory intent (see, e.g., *Bush*, 990 F.2d at 931), and there has been no hint that *St. Mary's* or any other more recent case law has affected that concept. If Cross could indeed identify a pattern under which white drivers were not disciplined for unexcused absences, late arrivals or log book malfeasance, Roadway's justification of Cross' citations would appear pretextual, for selective enforcement of facially neutral regulations is no less insidious than outright discrimination (*Fallon v. State of Illinois*, 882 F.2d 1206, 1211 (7th Cir.1989); *Friedel v. City of Madison*, 832 F.2d 965, 972 n. 5 (7th Cir.1987)).

But Cross fails totally in that effort. P. Mem. 6 proffers Clay Tucker ("Tucker"), a white driver who was hired on the same day as Cross back in 1984, contending that Tucker has neither been disciplined for illness or injury nor has even heard of anyone who had been (P. 12(n)(2) ¶ 11A, citing Tucker Dep. 15, 23). By thus focusing on a single white driver, Cross' counsel has been inattentive to the lesson taught by *Bush*, 990 F.2d at 931–32 as to what is required to show evidence of discrimination in that respect. But even taken on his own terms, Cross has presented a misleading portrayal of Tucker's testimony. What Tucker actually said was that he had never been disciplined *while on leave* with an extended injury or illness (*id.*). But neither has Cross for that matter—it is only *unexcused* absences that have prompted his discipline. Much more relevant for purposes of comparison, therefore, are the times that Tucker was *not* on leave, had exhausted his five sick days and nevertheless reported in as sick or otherwise unavailable for work. As for those situations, Tucker Dep. 29 states (reflecting treatment entirely comparable to what Cross testified as to his own experience):

**9.** Cross also often received no discipline under those circumstances (see D. 12(m) ¶¶ 48, 54, 64, 75, 87).

**10.** Indeed, the inference appears to cut in the other direction, for D.Mem. 4 (attempting to portray Cross' most grievous deficiencies) refers to his having been disciplined six times in one 13–month period. If that really represents Cross'

Q: But what about when you're at home and you called in and said you were sick and unavailable?

A: When I'm home and I'm sick and not available, I would say a good majority of the time I have always got a warning letter.[9]

It is plain that Tucker simply does not serve Cross' purposes here. When all is said and done, Cross admits that Tucker was disciplined no less than 35 times over his career, 16 of those instances (along with a three-day suspension) having stemmed from charges of absenteeism (D. 12(m) ¶¶ 138–39; Lamphere Aff. ¶ 23). Though Cross never suggests any exact figure as to how many times he himself was disciplined, there is no indication that his disciplinary file was thicker than Tucker's.[10] In any event, Cross has made no attempt to salvage his comparison by showing that Tucker was actually a more egregious offender and was disciplined relatively less frequently. In sum, absolutely nothing relating to Tucker supports any inference of pretext (see *Sims v. Mulcahy*, 902 F.2d 524, 540–41 (7th Cir.1990)).

Nor has Cross succeeded in tieing Roadway's adverse actions to any racial animus on Roadway's part. As *Sims, id.* at 541 has explained:

Not only did Sims fail to demonstrate that she was treated differently than similarly situated white employees, she also fell far short of establishing the required element of discriminatory intent. The record appears devoid of any example of evidence revealing that Sims' race was considered in any manner in the City's discipline of Sims for her tardiness.

Only a few moments need be spent on Cross's effort to imply such illegal motivation on Roadway's part.

Cross would have it that he "was repeatedly subjected to racial slurs and overtly dis-

worst performance, it would seem his total would not be likely to match Tucker's. But it should be emphasized that what controls the decision here is a matter of Roadway's bona fides and not mere bean-counting, and nothing tendered by Cross creates any doubts as to those bona fides.

criminatory conduct by Roadway personnel." But once again his record citations in purported support of that claim do not bear out his characterization. For one thing, on one occasion (about 1991) Cross was in the drivers' room at Roadway and heard someone call out the word "nigger" (Cross Dep. 194–95). But Cross has no idea who said it, nor did he bring the incident to management's attention (*id.*). Cross also complains of an incident in the latter half of 1991 when he asked a dispatcher named Don Soich ("Soich") if any long runs were available, to which Soich replied "the only thing he had long for me was in his pant[s], his long white dick" (Cross Dep. 280 errata).

It need scarcely be said that racial slurs are deplorable in an employment setting (*Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1133 (7th Cir.1994))—or, for that matter, in any other. But one or two [11] truly isolated epithets encountered in the course of a multi-year employment relationship do not give rise to an actionable claim of racial harassment under Title VII or Section 1981 (*North v. Madison Area Ass'n for Retarded Citizens–Developmental Ctrs. Corp.*, 844 F.2d 401, 409 (7th Cir.1988)). Exposure to those one or two episodes during a ten-year career as a truck driver (a profession not exactly known for its puritanical language in any case) is just not going to fill the bill.

Even beyond that, Cross has provided no evidence from which it could be inferred that any statement evincing any degree of racism was made by any person who had an actual hand in disciplining him. Because dispatcher Soich has never disciplined Cross (D. 12(m) ¶ 125) and because Cross cannot even ascertain who made the first comment, he has not been able to make the crucial connection linking the affront or affronts with Roadway's decisional process (*Young In Hong*, 993 F.2d at 1266; *LaMontagne v. American Convenience Prod., Inc.*, 750 F.2d 1405, 1412 (7th Cir.1984)). And Cross' few other efforts to label innocuous events as connoting racial bias are so patently lacking in merit that they do not warrant discussion.

In summary, no evidence anywhere in Cross' submissions gives rise to even the remotest inference that Roadway disciplined him because of his race or the color of his skin. It is worth noting parenthetically that the percentage of Roadway's employees at the Facility who are black has remained a constant 21% from 1989 through 1993 (D. 12(m) ¶ 7 and P. 12(n)(1) ¶ 7) [12]—scarcely an indication of race-based animus (see *Bush*, 990 F.2d at 932).

### Conclusion

All of Cross' contentions of race discrimination have proved to be wholly empty. There is no genuine issue of material fact, and Roadway is entitled to a judgment as a matter of law. This action is dismissed in its entirety.

---

**11.** Soich's crude remark would plainly be relevant in a case charging sex harassment, but it is at least questionable to classify it as exhibiting racial overtones. In any event, Cross is no better off even with the most favorable inference that would characterize the remark as race-biased.

**12.** Those objective numbers directly controvert Cross Dep. 324, where he said without any substantiation:

Every time a black leaves they do not replace him or her with a black. The turnover for blacks to whites on the firing is a big ratio.