**Marley S. CECILIO, Plaintiff,**

**v.**

**ALLSTATE INSURANCE COMPANY, Defendant.**

**No. 93 C 7757.**

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 14, 1995.

Vincent C. Argento, Law Offices of Vincent C. Argento, Elgin, Illinois, for plaintiff.

Paul R. Garry and Judith Y. Gaston, Bates, Meckler, Bulger and Tilson, Chicago, Illinois, for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Marley Cecilio ("Cecilio") has sued Allstate Insurance Company ("Allstate"), charging it with national-origin discrimination and retaliation in violation of Title VII ("Title VII," 42 U.S.C. § 2000e–2 and e–3) and with age discrimination in violation of the Age Discrimination in Employment Act ("ADEA," 29 U.S.C. § 623(a) and (d)). After Allstate moved for summary judgment under Fed.R.Civ.P. ("Rule") 56, both sides have complied with this District Court's General Rule ("GR") 12(m) and 12(n) [1] and the motion

---

1. This District Court designed GR 12 to facilitate the resolution of Rule 56 motions by highlighting the existence or nonexistence of factual disputes. GR 12(m) requires a Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of each of those facts. Then GR 12(n) requires the nonmoving party to respond point by point, with citations to the record in support of (1) any claimed disputes as to the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert. Allstate's GR 12(m) statement will be cited "A. 12(m) ¶—," while Cecilio's GR 12(n) responses and additional facts will be cited "C. 12(n) ¶—." Where Cecilio either explicitly or implicitly admits an assertion in A. 12(m), only

is fully briefed and ready for decision. For the reasons stated in this memorandum opinion and order, Allstate's motion is granted and this action is dismissed.

### Summary Judgment Standards

■ Familiar Rule 56 standards impose on Allstate the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to Cecilio (*Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). While "this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th Cir.1992)), that does not negate the potential for summary judgment in cases where a movant plainly satisfies the Rule 56 standards (*Washington v. Lake County*, 969 F.2d 250, 254 (7th Cir.1992)). In those terms summary judgment is appropriate if the record reveals that no reasonable jury could conclude that Cecilio was treated in a statutorily prohibited discriminatory or retaliatory fashion (*Kirk v. Federal Property Management Corp.*, 22 F.3d 135, 138 (7th Cir.1994)).

As with every summary judgment motion, this Court accepts nonmovant Cecilio's version of any disputed facts. What follows, then, is a version of the facts culled from the parties' submissions, with any differences between them resolved in Cecilio's favor. In that respect, however, GR 12(n) requires Cecilio to cite to the record (1) if she wants to demonstrate any errors in Allstate's version or (2) if she wants to rely on any additional facts. To the extent that Cecilio either (1) fails to make the required citations to the record or (2) merely offers theories or speculations instead of facts, GR 12(n) directs this

Court to accept Allstate's version as uncontroverted.

### Facts

On February 6, 1984 Cecilio, a 41–year–old Filipino woman, was hired by Allstate as a computer systems analyst and was given responsibility for maintaining computer systems in Allstate's Direct Marketing Center branch located in Northbrook, Illinois (C. 12(n) ¶¶ 1, 2, 6, 7; Cecilio Aff. ¶¶ 2–5; Cecilio Dep. 49, 55, 75). In September 1985 she was promoted to Marketing Project Coordinator, a job in which she was responsible for a unit of four or five employees who processed data contained on magnetic tapes (C. 12(n) ¶ 13), and by February 1987 she had been promoted to the position of Project Manager (C. 12(n) ¶ 15). At the time of that promotion she was transferred to a different branch of the Allstate entity—Allstate Enterprises, Inc. ("Enterprises")—and moved to an Allstate office in Arlington Heights, Illinois (C. 12(n) ¶¶ 15, 16).

Cecilio stayed with Enterprises until she was transferred in 1989 to the Direct Response unit (a branch of Allstate responsible for soliciting potential customers for health and life insurance), where she continued to hold the position of Project Manager (C. 12(n) ¶¶ 15, 20). When she arrived at Direct Response, Cecilio was placed under the supervision of Maryanne Fauley ("Fauley") (C. 12(n) ¶ 20).

In January 1991 Fauley gave Cecilio a Progress Development Summary ("PDS") in which Cecilio was rated "acceptable but needs improvement" (A. Ex. 5).[2] That negative evaluation (Cecilio's previous performance ratings had been on the "meets" expectations level) came as a surprise to Cecilio, who felt that it wrongly assessed her performance and was a product of Fauley's discriminatory attitude towards her (A. 12(m) ¶¶ 23, 25; C. 12(n) ¶ 27; Cecilio Dep. 193).

---

C. 12(n) will be cited. Exhibits will be cited as "A. Ex.—" or "C. Ex.—," and affidavits and depositions will be cited by referring to the name of the affiant or deponent and the page or paragraph number (e.g., "Cecilio Dep.—" or "Cecilio Aff. ¶—").

**2.** That was next to the lowest of the PDS' four employee ratings, which are (in descending order) "exceeds" expectations, "meets" expectations, "acceptable but needs improvement" and "requires immediate improvement" (C. 12(n) ¶ 11).

As is typical of such evaluation forms, the PDS was a several-page document describing and evaluating Cecilio's performance in a number of areas. While in some areas her performance was praised—she was commended for her "good organizational skills" and "good oral communication skills" (A. Ex. 5)—in many other areas her performance was cited as inadequate, including such comments as "she has not demonstrated an adequate knowledge of our business informational needs," "[e]xcept for routine data requests completed by her staff, most projects are late" and "improvement is needed in her written communication skills" (*id.*), and a notation that Cecilio was having problems training and managing her staff (*id.*). Finally, the PDS narrative portion concluded (A. 12(m) ¶ 25, A. Ex. 5):

> Overall, Marley's performance is acceptable but needs improvement. In order to provide her with the opportunity to develop and strengthen her technical and administrative skills and abilities, Marley is being transferred to the Life Corporate Systems Department ["Life Systems"] effective December 1. This is a temporary assignment for twelve months. A more disciplined and structured systems environment will hopefully provide Marley with the experience and training needed to successfully accomplish the accountabilities of a Project Manager.

When the PDS was actually written up, Cecilio had already been transferred to Life Systems (the transfer occurred in November 1990, Cecilio Dep. 197), where she was placed under the supervision of Yvonne Sharpe ("Sharpe") rather than Fauley (C. 12(n) ¶ 28). Under Sharpe's supervision, between December 1990 and May 1991 Cecilio received special training "provided to address the areas of concern covered in [Cecilio's] last PDS . . ." and designed to allow her to develop the skills necessary for her to succeed as a Project Manager (A. Ex. 6 at 3; C. 12(n) ¶ 28).

In May 1991 Sharpe gave Cecilio a PDS that rated Cecilio's improved performance at a "meets" expectations level, but noted that "Marley should understand that she has not been given the full compliment [sic] of assignments expected of a Systems Project Manager" (A. Ex. 6 at 3). In that regard the PDS stated that Cecilio's training period would cease at the end of May 1991 and that "[i]f she demonstrates her ability to *independently* continue at a 'meets' level using the knowledge she has obtained, during the next two months she will be given a full load over the summer and be re-evaluated (PDS only) under the accountabilities of a Systems Project Manager at the end of the year" (*id.* at 4; C. 12(n) ¶ 29).

In August 1991 Cecilio was assigned to work as a Systems Project Manager in the Direct Certificate Administration unit ("DCA") and was placed under the supervision of Thomas Klein ("Klein"), a Senior Division Director (C. 12(n) ¶ 31; Cecilio Dep. 274–75). As Senior Division Director Klein had 16 Project Managers and Senior Project Managers reporting to him, including African–Americans and Hispanics and—in terms of age—persons over 40 (C. 12(n) ¶ 31).

In November 1991 Klein assigned Cecilio responsibility for all of the DCA unit (C. 12(n) ¶ 30). Cecilio as Systems Project Manager and her staff of eight or nine employees provided the computer assistance needed for the Direct Response unit to market life insurance policies (*id.*; Cecilio Dep. 282).

In December 1991 Klein met with Cecilio and expressed some concerns he had with her performance relating to production problems and staff training (A. 12(m) ¶ 35; Klein Aff. ¶ 7). In January 1992 Klein told Cecilio that she was not performing well and that if he had to evaluate her performance then, he would rate her as "needs improvement" in at least three different categories (C. 12(n) ¶ 37). And in February 1992 Klein gave Cecilio a PDS in which her performance was rated as "acceptable but needs improvement" (*id.*; A. Ex. 7 at 10). At that time Klein met with Cecilio to discuss her performance and told her that she was having difficulty in several areas, including managing her unit, projecting appropriate time estimates for the projects her unit was doing, adequately planning out projects and appropriately setting unit priorities (C. 12(n) ¶ 37). At some point in the meeting Klein called in Debbie Sampson ("Sampson," a member of Allstate's human resources department) and both Klein

and Sampson told Cecilio that she had the capacity to improve her performance (C. 12(n) ¶ 39; Sampson Aff. ¶¶ 3, 4). During the course of the meeting Klein also set several performance goals for Cecilio to attain over the next 60 days (C. 12(n) ¶ 38, A. Ex. 7 at 8–9):

1. Marley must effectively demonstrate she can balance her sensitivity toward her staff with the Allstate corporate goals and objectives.

2. Marley must finalize and effectively administer the training programs of her staff.

3. Marley must become more customer focused. She must make the effort to listen to and to understand the (internal) customer.

4. Marley will be given projects or assignments which are abstract and not defined at a detailed level. As a Systems Project Manager, she should effectively plan and accumulate estimates on her project activities.

5. Marley will be expected to meet the requirements and defined outputs of these tasks without extensive involvement on the part of management.

6. Marley must become more effective in identifying the needs and priorities of her coworkers by actively seeking their input.

And the PDS said that if Cecilio did not improve her performance within the 60–day time frame, she would be put on "requires immediate improvement" status (A. Ex. 7 at 8).

Each PDS form has a space for "employee comments," to be filled in after the supervisor and employee meet to discuss its terms.

In this instance Cecilio wrote in that section (C. 12(n) ¶ 39; A. Ex. 7 at 10):

Tom [Klein] and I, and later with Debbi Sampson—talked about this review and spoke candidly about performance issues. Under the circumstances, and working with the conditions, I feel that this is a valid evaluation.

After receiving the February 1992 PDS Cecilio sent a voice mail to her peers, to her direct subordinates and to Klein and Sampson (C. 12(n) ¶¶ 40, 63; Cecilio Dep. 386–88), stating that she had been given an "acceptable but needs improvement" PDS, that she was considering leaving Allstate and that she was considering consulting legal counsel about her negative performance evaluation. Cecilio has belatedly asserted that the voice mail also complained that she was being subjected to discriminatory treatment (Cecilio Aff. ¶ 21).[3]

In response to the voice mail, Klein placed Cecilio on "job in jeopardy" status, stating these reasons in a March 25, 1992 document acknowledged by Cecilio (A. Ex. 8):[4]

The telephone message Marley sent March 10 has caused disruption within the department and possibly areas outside of our department. Some of the managers in my division have expressed concerns about the stability of their employment at Allstate. Marley has indicated that she shared the same information described above with her staff. Based upon her judgement [sic] and management decisions, I have lost a great deal of confidence in Marley's abilities to use sound judgement [sic] and discretion when dealing with matters of a sensitive and confidential nature. Marley is a project manager with eight years of service

---

3. Cecilio's first assertion to that effect appears in her Aff. ¶ 21. In her earlier deposition she had been questioned about the incident but had said not a word about her having complained of discriminatory treatment in the voice mail (Cecilio Dep. 386–88). Similarly, her retaliation charge with the EEOC states that she was "retaliated against for having filed an earlier charge of employment discrimination" (A. Ex. 17), but she does not mention any earlier *complaints* of discrimination. Under the circumstances this Court would be entirely justified in disregarding Cecilio's affidavit (see *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir.1995), which criticizes and discredits litigants' attempts to patch up their deposition testimony with their own later affidavits). But the ensuing discussion shows that the affidavit assertion does not avoid summary judgment anyway, and so this Court will give Cecilio the benefit of the doubt and credit her assertion.

4. In contrast, Cecilio claims that she was placed on "job in jeopardy" status because, as she now claims (see n. 3), her voice mail message had complained of discriminatory treatment (C. 12(n) ¶ 40; Cecilio Aff. ¶ 22).

and must clearly understand that her behavior was inappropriate and has created tension within the department.

That "job in jeopardy" warning [5] was directed only at the voice mail incident and did not address Cecilio's work performance, which remained on the separate 60–day review (C. 12(n) ¶ 40).

After the February 27, 1992 PDS, Klein and Cecilio met on a regular basis to discuss Cecilio's performance, specifically in terms of the goals that Klein had set for her (C. 12(n) ¶ 41). On April 9 and April 20, Klein and Sampson met with Cecilio and Klein informed Cecilio that she was not meeting those goals (id.).

According to Cecilio, Klein mistreated Cecilio during the period that he was supervising her (Cecilio Aff. ¶ 24):

> This treatment included Klein raising his voice at everything I said and in derogatory and demeaning voice and gestures, he mimicked my voice in a high pitched tone and mimicked my heritage by blankly staring and by his subservient gestures. He embarrassed and ridiculed me within the hearing of managers, staff, and contract programmers on the floor, in an unabating tone and voice.

Cecilio also felt that Klein's slow and deliberate manner of speaking to her implied that he thought that she was old and senile or "an Asian foreigner who could not understand or speak English" (C. 12(n) ¶¶ 7, 41; Cecilio Dep. 571).

On April 14, 1992 Cecilio filed a charge of discrimination with EEOC, alleging that she had been subjected to discriminatory terms and conditions of employment on account of her age and national origin (C. 12(n) ¶ 42; A. Ex. 9). After that filing Cecilio says that Klein treated her "worse than before, such as, increased hostility towards me, mimicking my accent, refusing to answer my questions for assistance and a general all around dislike for me" and also that Klein refused to provide her with guidance or assistance (Cecilio Aff. ¶ 26, 28).

Ten days after her EEOC filing Cecilio wrote a letter to Klein about the February 27, 1992 PDS (C. 12(n) ¶ 42; A. Ex. 11). In her letter Cecilio challenged the validity of the "references and citations" that Klein had made to the earlier PDSs administered by Cecilio's prior supervisors Fauley and Sharpe (A. Ex. 11). As for her performance under Klein, Cecilio characterized his evaluation of that performance as demeaning, lacking integrity, destructive, overly focused on the negative, and full of distortions and contradictions (id. at 9). Cecilio also questioned whether Klein was taking into account the relevant time frame in making his evaluation (id. at 8–9).

In response to that lengthy letter, Klein wrote a memorandum to Cecilio in which he reminded her that her initial response to the PDS was that it was "valid." Klein also observed that Cecilio's letter did not address the performance goals that he had set for her (A. Ex. 12):

> Since these 6 goals will be the primary focus for measuring your performance, I encourage you to direct your attention to them and not limit your efforts to past evaluations or interpretations of perceived hidden meanings in my recent evaluation of your work. I will be more than happy to clarify any written or verbal statements I make regarding your performance during our weekly one-on-one meetings or whenever you feel clarification is necessary.

On May 1, 1992—more than 60 days after Cecilio was given the "acceptable but needs improvement" PDS and the 60–day performance goals—Klein gave Cecilio a new PDS that rated her performance as "requires immediate improvement" (C. 12(n) ¶ 44; A. Ex. 13). That PDS reviewed Cecilio's performance in relation to the goals that had been set for her—noting that she had reset the original target dates for several staff training programs, had displayed a poor understanding of the projects her staff was working on

---

**5.** Cecilio asserts (citing only her own affidavit) that placing her on immediate "job in jeopardy" status was in violation of Allstate policy. But in response to Cecilio's statement of additional pur-

portedly undisputed facts, Allstate has furnished a supplemental Sampson affidavit and an attached Ex. 2, which unequivocally establish otherwise.

and was having some problems managing her staff—and concluded that she had fallen short. It concluded by advising Cecilio that if her performance did not improve within the next 30 days, she would be placed on "job in jeopardy" status (*id.*).

During May 1992 Klein and Sampson met with Cecilio on four occasions to discuss her performance (Sampson Aff. ¶ 6), and on May 29, 1992 Klein issued a "job in jeopardy" PDS to Cecilio (C. 12(n) ¶ 45; A.Ex. 14). After again detailing Cecilio's failure to meet her performance goals (including her repeated failure to establish and adhere to a training schedule for her staff in a timely manner, her failure to attend weekly staff meetings, her failure to meet target dates on projects, her failure to control the budget on one of her projects and her failure to have an appropriate level of understanding of the projects her staff was working on), the PDS stated that if Cecilio did not improve her performance within 30 days her employment would be terminated (A. Ex. 14 at 6). In response Cecilio wrote a memo asserting that she had in fact met all performance goals (C. 12(n) ¶ 46; A. Ex. 15).

In Klein's estimation, Cecilio's performance did not improve in the 30–day period following the issuance of the "job in jeopardy" PDS (A. 12(m) ¶ 48). There was also an incident during that period in which Cecilio terminated an employee in the exercise of what Klein felt was poor managerial judgment (A. 12(m) ¶¶ 47, 48). On June 30, 1992 Cecilio was terminated based on Klein's recommendation. As already stated in n. 3, on July 9, 1992 Cecilio filed a second charge with the EEOC in which she alleged that Allstate had terminated her employment in retaliation for filing a charge of discrimination (C. 12(n) ¶ 49, A. Ex. 17).

### Cecilio's Claims

 In any state that (like Illinois) has a state agency designated for the consideration of discrimination claims, a claimant has 300 days after the discriminatory act within which to bring his or her charge before EEOC (*Koelsch v. Beltone Elec. Corp.*, 46 F.3d 705, 707 (7th Cir.1995)). Unless the claimant qualifies for a tolling of that time period based on equitable grounds, earlier acts of asserted discrimination are outlawed by limitations (*id.*).

As already stated, Cecilio's first EEOC charge was filed on April 14, 1992. That cuts off the actionability of any claimed acts of discrimination before June 12, 1991 (300 days before Cecilio filed the charge) unless equitable grounds for tolling exist.

 Cecilio seeks to avoid that limitations bar by invoking the "continuing violation" doctrine—she contends that Allstate's discriminatory acts were "discretely committed" and amounted to a "pattern and practice" of discriminatory treatment.[6] But she plainly does not qualify under the continuing violation theory, which is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would recognize the discriminatory character of the acts in question (*Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445–46 (7th Cir.1994). Thus if Cecilio "knew, or with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed her, she must sue over that act within the relevant statute of limitations" (*Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir.1994) (internal quotation marks omitted)).

Quite apart from the question whether the alleged acts fit the notion of a "series" so as to demonstrate a "pattern and practice," Cecilio must lose on this issue because she was unquestionably aware of the allegedly discriminatory acts all along (and certainly well before June 12, 1991)—see *Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279, 281–82

---

6. Cecilio Mem. 6 asserts that the acts that allegedly amounted to a pattern and practice of discriminatory treatment include:
 (1) Non–Asian employees were hired into technical positions;
 (2) Lower salary paid to Plaintiff than paid to Pat Barry [a white Allstate employee];
 (3) Refusal to transfer into a technical area;
 (4) Denial of training and use of computer systems and programs;
 (5) Failure to follow company policy in regards to job performance reviews (PDS); and
 (6) Denial of a salary increase.

(7th Cir.1993) ("the fact that a series of discriminatory or otherwise unlawful acts is indeed a series, a continuum, rather than a concatenation of unrelated acts, will delay the deadline for suing with respect to the earliest acts in the series only if their character was not apparent when they were committed but became so when viewed in the light of the later acts"). For example, Cecilio admits that she was aware at the time that she was hired that only younger people were hired into technical positions (C. 12(n) ¶¶ 9, 10), that she was aware of Allstate's failure to provide training (*id.* ¶ 14), that she was aware of the pay differential before June 1991 (*id.* ¶ 21, Cecilio Dep. 159–60) and that while under Fauley's supervision she was aware that she was being treated differently and not evaluated as frequently as other employees during the time frame that such actions were occurring (C. 12(n) ¶ 26; Cecilio Dep. 209–18). Moreover, Cecilio admitted that she felt that she was being discriminated against from 1984 through 1988 (C. 12(n) ¶ 18).

■ Hence Cecilio's claims of discrimination based on actions by Allstate before June 12, 1991—specifically her claims of discriminatory hiring, placement, assignment of jobs, training, pay and irregular performance reviews—are not now actionable. Those claims will be discussed no further.

■ Another narrowing of the areas in controversy stems from Cecilio's post-termination filing with EEOC on July 9, 1992, in which she complained only that she was the victim of retaliatory discharge. Despite that, her complaint filed with this Court alleged that her termination was the product of both retaliatory *and* discriminatory discharge. On April 19, 1994 this Court ruled orally (that day's Tr. 5–7) that unless Cecilio were to provide a valid reason to the contrary, the claims made in this Court would be limited to the scope of the charge that she had filed with the EEOC. No such reason having been offered, Cecilio's claim in this action

relating to her termination cannot go beyond the assertedly retaliatory nature of her discharge.

After the smoke clears, then, Cecilio is left with two claims: (1) she was discriminated against on the basis of her age or national origin or both by being subjected to criticism and to poor performance reviews and (2) she was discharged in retaliation for having complained about such discrimination. This opinion addresses those claims in turn.

### *Title VII and ADEA Standards— Discrimination*

■ In terms of post-June 12, 1991 events, Cecilio claims that Allstate violated both Title VII and ADEA by burdening her with poor performance reviews and criticism on account of her national origin or age or both.[7] *Mojica v. Gannett Co.*, 7 F.3d 552, 561 (7th Cir.1993) (en banc) (most citations omitted) has set out Cecilio's burden succinctly:

> In any discrimination case, the plaintiff bears the ultimate burden to prove, by a preponderance of the evidence, that his employment was adversely affected by his protected class status. The plaintiff can meet this burden either by presenting direct evidence of discrimination or by successfully navigating the course of shifting burdens authorized in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ Direct evidence of discrimination is "evidence that can be interpreted as an acknowledgement of discriminatory intent by the defendant or its agents" (*Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). Because Cecilio has offered no such evidence, she must—like most discrimination plaintiffs—attempt to create the presumption of discrimination through the *McDonnell Douglas* approach. Under that well-established framework, Cecilio must first establish a prima facie case by showing[8] that (1) she

---

7. This opinion will discuss Cecilio's Title VII and ADEA claims together, for they arise out of the same set of facts and the governing legal standards are the same (see *Visser v. Packer Eng'g*

*Assocs., Inc.*, 924 F.2d 655, 657, 660 (7th Cir. 1991) (en banc)).

8. Of course, in the present summary judgment context Cecilio does not have to "show," "prove"

belongs to some protected class, (2) she performed her job satisfactorily, (3) she suffered an adverse employment action and (4) her employer treated similarly-situated employees outside of her class more favorably (*Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir.1994)). If she succeeds in making that showing, the burden of production (though not of proof) shifts to Allstate to articulate a "legitimate, nondiscriminatory" explanation for the adverse employment action (*id.*). Finally, if Allstate meets that burden, Cecilio must show that Allstate's stated and apparently legitimate reasons for its actions were a mere pretext for the prohibited discrimination (*id.* at 747).

■ Although that approach provides a useful vehicle for analyzing employment discrimination cases, overly rigid adherence to its framework can sometimes pose practical difficulties and result in unnecessarily repetitive analysis (for more discussion on that point see this Court's opinion in *Cross v. Roadway Express*, 861 F.Supp. 698, 702 (N.D.Ill.1994)). To avoid such repetitiveness, cases such as *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir.1990) have held that it is unnecessary to decide whether the employee has met his or her burden of establishing a prima facie case if the employee cannot meet the burden of showing pretext in any event. This opinion will follow *Holmberg*'s advice and begin at the pretext stage, potentially saving needless repetition.

■ Pretext "means a lie, specifically a phony reason for some action" (*Russell*, 51 F.3d at 68). It is important to remember that Title VII and the ADEA do not vest federal courts with the authority to act as roving personnel departments and to second-guess employers' good faith business judgments (see, e.g., *Smith v. General Scanning, Inc.*, 876 F.2d 1315, 1321 (7th Cir.1989)). Instead what controls is the "perception of the decision maker" (*Karazanos v. Navistar*

*Int'l Transp. Corp.*, 948 F.2d 332, 337–38 (7th Cir.1991), quoting *Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989)) and whether that decisionmaker "honestly believes in the reasons [he] offers" (*McCoy*, 957 F.2d at 373).

It should come as no surprise that Allstate's proffered reason for Cecilio's poor performance evaluations is that she was performing poorly. In support, Allstate points to a host of items showing initially marginal and then deteriorating performance:

1. Fauley's January 1991 PDS that rated Cecilio's performance as "acceptable but needs improvement" and cited her inadequate knowledge of informational needs, late projects, poor written communication skills and problems in training and managing her staff;

2. Sharpe's May 1991 PDS that rated Cecilio's performance at a "meets" expectations level, but pointed out that she was not being given the full responsibility and workload normally expected from her position;

3. the December 1991 meeting between Klein and Cecilio in which Klein (the third supervisor to raise such questions) expressed concerns about Cecilio's performance in the areas of production and staff training;

4. the January 1992 meeting between Klein and Cecilio in which Klein referred to Cecilio's problems in communicating with members of her unit and said that if he had to evaluate her performance then, he would rate her as needs improvement in at least three categories;

5. the February 1992 PDS that characterized Cecilio as having problems in the areas of managing her unit, planning projects, timeliness and setting priorities for her unit and rated her performance as "acceptable but needs improvement";

6. Cecilio's initial acknowledgement of the validity of the assessment of her per-

or "establish" anything. Rather her lesser burden is to create a genuine issue of material fact (after having been given the benefit of reasonable inferences) as to each of the substantive areas dealt with in this opinion. That is the standard consistently applied here, even though this opinion most often employs the more stringent-sounding language to avoid the awkward repetition of the "genuine issue of material fact" phraseology and to mirror the discussion in the principal cases in this area of the law.

formance in the February 1992 PDS by writing that she felt that it was a "valid evaluation";

7. the April 1992 meetings between Klein, Sampson and Cecilio in which Cecilio was informed by Klein that she was not meeting the six performance goals set out for her in the February PDS;

8. the May 1, 1992 PDS that rated Cecilio's performance as "requires immediate improvement," observing that she had reset the original target dates for several staff training programs, had displayed a poor understanding of the projects her staff was working on, and was having some problems managing her staff; and

9. the May 29, 1992 PDS that placed Cecilio on "job in jeopardy" status, finding that she had failed to meet her performance goals—specifically that she had again failed to meet the target dates for staff training, she did not consistently attend weekly staff meetings, she failed to meet target dates on projects, she failed to control the budget on one of her projects and she failed to have an appropriate level of understanding of the projects that her staff was working on.

■■■■■ Cecilio attempts to show pretext in part by asserting that her performance was in fact adequate and tries to rebut some (but by no means all) of her cited inadequacies by way of her own affidavit. If this Court were a second-level reviewing supervisor called upon to evaluate Klein's appraisal of Cecilio's performance, such an approach might be of more help to her.[9] But Cecilio's *self-perception is not relevant.* It is rather the perception of the decisionmaker (here mainly Klein) that matters. As *Russell,* 51 F.3d at 69 put it:

> [A]ll that [plaintiff] could offer was his opinion that his performance ... was adequate. But the issue was not the adequacy in fact of his performance. It was the honesty of the company's belief that it was inadequate, and as to this [plaintiff] had no basis for testifying.

Accord, *Schultz v. General Elec. Capital Corp.,* 37 F.3d 329, 334 (7th Cir.1994) (internal quotation marks omitted) ("an employee's own self-serving remarks standing alone are insufficient to raise doubt as to the credence of the employer's explanation for termination"); *Karazanos,* 948 F.2d at 337–38, again quoting *Weihaupt* ("The employee 'must do more than challenge the judgment of his superiors through his own self-interested assertions ... The employee's perception of himself ... is not relevant' ").[10]

■■■■■ There are also other reasons why Cecilio's current positive assessment of her own performance is insufficient to raise a factual issue as to pretext. First, she herself contemporaneously wrote that she felt that the February 1992 PDS was "[u]nder the circumstances ... a valid evaluation," and it was not until after she had later filed a charge of discrimination that she changed her tune. Second, much of her protestations of satisfactory performance consist of nothing more than her own conclusory assertions in her affidavit and in memos that she wrote to Klein in response to his evaluations. She does not point to any *facts* to support her assertions, and she does not even address several of the performance concerns outlined

---

9. Even in that event, though, Cecilio could not withstand summary judgment, given the lack of real *evidence* of adequate performance that she has presented.

10. Cecilio seeks to beef up her self-evaluations by referring to affidavits of her onetime supervisor Sharpe, two subordinates (who did not work with or for her in the relevant 1992 time frame) and an employee who occupied the cubicle next to Cecilio during the period when Cecilio was under Klein's supervision (but who did not work in Cecilio's unit). Those affidavits are quite general and do little more than establish that each affiant believes Cecilio was a good Project Manager. But even apart from the factors that make those affidavits non-probative on the specific issue (Cecilio's performance of her assignments in 1992), any such statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance are ordinarily given little if any weight in the key inquiry—"whether the employer honestly based its employment decision on performance-related considerations" (*Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1460 (7th Cir.1994)). In this case, as in *Dey* and like cases, the cited statements do not suffice to create a genuine factual issue as to the bona fides of Allstate's (that is, Klein's) evaluations.

by Klein (such as her failure to meet target dates for staff training).[11]

In sum, Cecilio has offered nothing to suggest that Klein did not believe in the validity of the assessments he was making. And that spells defeat for her claim.

■ As stated earlier, Cecilio also points to remarks and gestures assertedly made by Klein as evidencing his display of a discriminatory attitude: that he used "derogatory and demeaning voice and gestures," "mimicked my voice in a high pitched tone" and "mimicked my heritage by blankly staring and by his subservient gestures." Cecilio also felt that he was mimicking her accent and that his slow and deliberate manner of speaking to her implied that he thought she was old and senile or "an Asian foreigner who could not understand or speak English."[12] Of course any supervisor's asserted conduct of that nature is extremely troublesome, but such actions do not without more create the inference of a Title VII or ADEA violation (see *Young In Hong v. Children's Memorial Hospital,* 993 F.2d 1257, 1266 (7th Cir.1993)).[13] As in *Young In Hong, id.,* Cecilio "has failed to provide the requisite nexus between [the supervisor's] remarks and the ... termination decision."

■ In conclusion, Cecilio has offered nothing to create a legitimate inference that Klein's reasons for giving her poor performance evaluations were pretextual. Instead, at most she has shown that *in her mind* she

believed that Klein used the performance evaluations as a cover-up for a discriminatory motive. But what controls is that the actual evidence could not lead a reasonable jury to the same conclusion.

*Retaliation*

■ What remains for analysis is Cecilio's claim that Allstate terminated her employment in retaliation for her earlier filing of the discrimination charge. Such retaliation claims under Title VII and ADEA follow the same ping-pong approach as do discrimination claims.[14] First the employee must establish a prima facie case by showing (1) her statutorily protected expression (by having made the discrimination charge), (2) an adverse action by the employer and (3) a causal link between the protected expression and the adverse action (*Johnson v. Sullivan,* 945 F.2d 976, 980 (7th Cir.1991)). Next the burden of production (not of persuasion) shifts to the employer to state a legitimate nondiscriminatory reason for the action (*id.*). And then the burden of production bounces back to the employee to show that the employer's proffered reasons are pretextual (*id.*). As with the discrimination claim, this opinion will prescind the prima-facie-case issue and will instead focus on Allstate's reason for firing Cecilio and whether she can meet her burden of raising a genuine issue as to that reason's being pretextual rather than honestly held.

---

**11.** To be sure, a fair portion of Klein's evaluations of Cecilio reflect his subjective assessments of her performance, making them difficult to challenge. However, neither Title VII nor ADEA precludes an employer from using subjective criteria to evaluate employees. As *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1571 (7th Cir. 1989) (citations omitted) has explained in the ADEA context (equally applicable to Title VII):

> An employer can set whatever performance standards he wants, provided they are not a mask for discrimination on forbidden grounds such as race or age. He can set unrealistic standards and fire an employee for not being able to meet them ... He can be as arbitrary as he wants—he just cannot treat an older employee more harshly than a younger one.

**12.** In her responsive Mem. 4 Cecilio also asserts that Klein made statements to Cecilio about her age. That assertion is not supported by *anything*

in the record. Like the boy who cried "Wolf!", lawyers ought to realize that advancing such empty assertions not only does their clients no good in those terms but may also cast a cloud on the credibility of the client's other subjective statements. Nonetheless this opinion does not hold that false claim against Cecilio on the current Rule 56 motion.

**13.** Even though this opinion has credited Cecilio's version (see *Summary Judgment Standards* ), it is worth noting that here too she has provided this Court with nothing more than her personal (and self-serving) interpretation of Klein's actions. Thus she identifies no statements or comments of a discriminatory nature, but rather speaks of gestures and voice inflections that she interpreted as discriminatory.

**14.** Cecilio has offered no "direct" evidence of retaliatory motive.

So the analysis here is equivalent to that already described as to Cecilio's discrimination claim. Again Allstate's proffered reason for its action—this time Cecilio's termination—is Cecilio's track record of poor performance that went uncorrected despite warnings and the setting of performance goals. And again it is Cecilio's burden to show (in the more limited Rule 56 sense, see n. 8) that reason is pretextual. On that score Cecilio's responsive memorandum challenges Allstate's reason for terminating her by advancing arguments as to (1) her job performance and (2) the timing of the events leading up to her termination—specifically focusing on the close proximity in time between Cecilio's complaints of discrimination and Allstate's actions.

So far as her job performance is concerned, Cecilio's proof fails here for the same reasons that it failed on the discrimination claim. There is no need to repeat the earlier discussion in that respect.

As for the sequence of events leading up to Cecilio's termination, she urges that those events establish retaliation—and not poor performance—as the reason for her termination. But upon examination her contentions to that effect prove to be empty.

 First, Cecilio's Mem. 2 states:

> It was not until Plaintiff complained of discriminatory treatment and filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) that defendant found problems with Plaintiff's performance.

That statement is directly belied by the record. In January 1991 Fauley had evaluated Cecilio's performance as "acceptable but needs improvement" and sent her to Sharpe for special training. Then in December 1991 and January 1992 Klein had expressed concerns about Cecilio's performance, and in February 1992 he had evaluated her performance as "acceptable but needs improvement." Indeed, it was not until after receiving that evaluation that Cecilio first complained of discriminatory treatment (in her voice mail), and she did not file her EEOC charge until April 1992. In short, Allstate labeled Cecilio's performance as subpar on a number of occasions *before* she began to complain of discriminatory treatment. There is simply no way in which the sequence of events alone suggests that Allstate's termination of Cecilio, based on Klein's assessment of her poor performance, was a pretext for a retaliatory motive.

Cecilio also attempts to make much of the voice mail incident followed by her placement on "job in jeopardy" status. While the law does forbid an employer from disciplining an employee because she complained of purported discrimination, an employer is free to discipline an employee for non-retaliatory reasons. And in this instance Klein offered unimpeachably legitimate reasons for his actions.[17] Once again Cecilio offers nothing other than the mere sequence of events to suggest that Klein's stated reasons were a pretext for retaliation.

Finally Cecilio's Mem. 3 contends that because she "has established that an adverse action was taken after these complaints of discrimination, the jury could find in her favor." That displays a fundamental misunderstanding of the law: Such a showing is not even enough to make out a prima facie case of retaliation, let alone to survive a summary judgment motion. Instead Cecilio has to show that Allstate's purported reason for firing her—poor performance—was a "phony reason," and she has simply failed to do so.

### Conclusion

Allstate has met its burden of establishing that there is no genuine issue of material fact as to Cecilio's discrimination and retaliation claims, and it is entitled to a judgment as a matter of law. This action is dismissed with prejudice.

---

**17.** As n. 5 reflects, Cecilio is flat-out wrong in labeling Klein's actions as violative of company policy.